**AMERICAN POSTAL WORKERS UNION, AFL–CIO, Appellants,**

**Wilma M. Carter, et al.**

**v.**

**UNITED STATES POSTAL SERVICE, et al.**

No. 81–2174.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1982.

Decided May 6, 1983.

Darryl J. Anderson, with whom Anton G. Hajjar, Washington, D.C., was on the brief, for appellants. Thomas F. Bianco, Rockville, Md., also entered an appearance for appellants.

Rebecca L. Ross, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., and Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellees.

Before TAMM and SCALIA, Circuit Judges, and OLIVER GASCH,* U.S. Senior District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In late 1978 the American Postal Workers Union (APWU) learned that the Office of Personnel Management (OPM), at the behest of the United States Postal Service (USPS), had changed the method by which it calculates the civil service retirement benefits of certain postal workers retiring after February 11, 1978. This change substantially reduced the expected annuities of some 113,000 future retirees. APWU and several individual union members affected by the change filed suit against OPM[1] and USPS in the United States District Court for the District of Columbia, alleging that the defendants' actions violated the due process clause of the fifth amendment to the United States Constitution, the Postal Reorganization Act, the Civil Service Retirement Act, and the Administrative Procedure Act. Judge John Garrett Penn granted the defendants' motion for summary judgment, and plaintiffs appealed to this court. Because we agree that there were no disputed issues of material fact and that appellees were entitled to judgment as a matter of law, we affirm.

## I. BACKGROUND

### A. *Origin of the Method of Computation*

The past truly is prologue to this controversy. In 1920 Congress passed the first civil service retirement act, which provided that any eligible employee in the classified

---

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1976).

1. Plaintiffs also sued the then-director of OPM, Alan K. Campbell, both individually and in his official capacity. Pursuant to Fed.R.App.P. 43(c)(1), the present director of OPM, Donald J. Devine, is substituted for Alan K. Campbell in his official capacity.

civil service could receive an annuity based upon his or her years of federal service and average annual salary. Act of May 22, 1920, ch. 195, 41 Stat. 614. To help finance the retirement system, the Act authorized the withholding of a percentage of each covered employee's "basic salary, pay, or compensation" and contribution of the amount withheld to the civil service retirement and disability fund. *Id.* § 8, 41 Stat. at 618. The Commissioner of Pensions, under the direction of the Secretary of the Interior, was charged with administration of the statute. *Id.* § 4, 41 Stat. at 616.

When the federal retirement system was instituted, postal workers were employed by a department of the United States Government, the United States Post Office Department, Act of June 8, 1872, ch. 335, §§ 1–2, 17 Stat. 283, 283–84, and were members of the classified civil service, Act of Jan. 16, 1883, ch. 27, § 6, 22 Stat. 403, 406. Like other federal civil servants, they were eligible for retirement benefits. Indeed, postal employees were instrumental in securing passage of the 1920 act. 59 Cong. Rec. 6287 (1920) (remarks of Rep. Nelson). Computation of a regular full-time postal worker's annuity posed no problem; like that of any other federal worker, a postal worker's annuity depended on two components: the worker's years of federal service and the average of the employee's annual pay over a statutorily prescribed number of years.[2] Not all postal workers, however, were regular full-time employees. Because processing and delivering mail had to be done on a daily basis, a full complement of postal workers was required· at all times, and· the Post Office employed "substitutes" to do the work of absent employees. *See generally* Act of Mar. 3, 1905, ch. 1480, 33 Stat. 1082, 1085–86; Act of June 27, 1884, ch. 126, 23 Stat. 60; Act of Aug. 2, 1882, ch. 373, § 2, 22 Stat. 185, 185–86.

Postal substitutes were unique in that the time they actually worked was far less than the time during which they had to be available for work. Obviously, the Post Office could not efficiently hire a new worker each time a regular employee was absent on short notice. Thus, the Post Office maintained a pool of acceptable substitute employees, who actually worked only when needed to replace absent regular employees. Congress demonstrated its awareness of this unique feature of postal substitute employment by providing in the 1920 retirement act that in giving a substitute credit for service, the Secretary of the Interior could include only the amount of time actually worked. Act of May 22, 1920, ch. 195, § 3, 41 Stat. 614, 616.

In 1926 a joint committee of Congress heard testimony about the predicament of postal substitutes. They were paid a small hourly wage only when they actually worked, which was infrequent and unpredictable. A substitute's income, therefore, was generally not enough to provide a decent living, yet substitutes were unable to secure any additional employment because they had to be available for postal work at all times. It was suggested that substitutes be recompensed for these onerous employment conditions. *The Civil Service Retirement Act: Joint Hearings Before the Senate and House Committees on Civil Service,* 69th Cong., 1st Sess. 63, 66, 68 (1926) (testimony of M.T. Finnan, Secretary, National Association of Letter Carriers). The bill reported by the committee and passed by Congress amended the retirement law to require that a substitute's credited service include the entire period of employment as a substitute, regardless of the actual time worked. Act of July 3, 1926, ch. 801, § 5, 44 Stat. 904, 907. Thus, by 1926 it was established that for the purpose of annuity computation, postal substitutes would receive service credit for time during which they had not actually worked.

---

**2.** Since 1920 Congress has prescribed various methods of computing retirement benefits, but all the methods have used the same two determining factors: years of service and average annual salary. *See* 5 U.S.C. § 8339 (1976 & Supp. V 1981); Act of May 29, 1930, ch. 349, § 4, 46 Stat. 468, 471–72; Act of July 3, 1926, ch. 801, § 4, 44 Stat. 904, 907; Act of May 22, 1920, ch. 195, § 2, 41 Stat. 614, 614–15.

In 1928 a decision of the Comptroller General laid the foundation for substitutes to receive salary credit for pay that they had not actually earned. In that case a federal employee who held two positions, one with the Veteran's Administration and one as a postal substitute, was alleged to have violated a statute establishing a maximum annual federal salary. *See* Act of Aug. 29, 1916, ch. 417, 39 Stat. 556, 582. The Comptroller General ruled that for the purpose of determining whether a postal substitute had earned more than the statutory maximum annual salary, the substitute's salary "per annum" was not the pay actually earned but rather the worker's annual salary *rate,* calculated by multiplying the substitute's hourly wage by the number of possible work hours in a year. *Compensation—Double,* 8 Comp.Gen. 261, 263 (1928). On the basis of this ruling, the Secretary of the Interior likewise began computing substitutes' annuities on the basis of the employee's average annual salary *rate* rather than the pay actually earned. *See* Brief for Appellees at 5. Because the retirement system was partially financed by money withheld from employees' actual pay, the effect of using this hypothetical full-time salary in the computation formula was that substitutes' benefits were disproportionate to the substitutes' contributions to the retirement fund.

In the 1956 civil service retirement act, Congress reaffirmed its approval of giving substitutes service credit for the entire period of their employment, regardless of the time actually worked. Civil Service Retirement Act Amendments of 1956, ch. 804, sec. 401, § 3(a), 70 Stat. 736, 743, 745 (codified as amended at 5 U.S.C. § 8332(b)(1) (1976 &

Supp. V 1981)). However, Congress never explicitly approved the practice of giving substitutes salary credit on the basis of a hypothetical full-time salary. Thus, substitutes' receipt of annuities based on a hypothetical full-time salary derived solely from administrative practice.

In 1970 Congress passed the Postal Reorganization Act (PRA), Pub.L. No. 91–375, 84 Stat. 719 (1970) (codified at 39 U.S.C. §§ 101–5605 (1976 & Supp. V 1981)), which created USPS as an independent executive agency, *id.* sec. 2, § 201. Although the PRA removed postal employees from the competitive civil service, *id.* § 1001, it expressly provided that postal workers would continue to be covered by the civil service retirement system, *id.* § 1005(d).

The Civil Service Commission and OPM [3] continued to compute substitutes' annuities using the hypothetical full-time salary until 1978. In January of that year, with no notice to the APWU or to individual postal workers, OPM decided that, effective February 11, 1978, only actual pay would be included in the computation of the substitutes' average annual salary. The change in the annuity computation formula was made after USPS, in a series of communications to OPM in 1977, expressed its view that substitutes were no longer entitled to receive annuities computed using the hypothetical full-time salary. *See* Brief for Appellants at 12–14 (summarizing USPS's contacts with OPM). Appellants allege that USPS was motivated to seek the change in the annuity computation method by the threat of having to pay some $150 million in unfunded liabilities of the civil service retirement fund.[4] *See* Brief for Appellants

3. In 1934 the Civil Service Commission (CSC) replaced the Commissioner of Pensions as administrator of the civil service retirement law. Exec.Order No. 6670 (1934). In 1978 OPM succeeded to all the rights and duties of the CSC in administering the retirement law. Civil Service Reform Act of 1978, Pub.L. No. 95–454, § 906(a)(2), (3), 92 Stat. 1111, 1224–25. We will use "OPM" and "CSC" interchangeably.

4. The only postal substitutes who had ever been covered by the civil service retirement law were "career" substitutes. "Temporary" sub-

stitutes had never been in the civil service retirement system. *See* 59 Cong.Rec. 2845–47 (1920) (remarks of Senators Sterling and King); *see also Post Office Appropriation Bill, 1921: Hearings Before the House Comm. on the Post Office and Post Roads,* 66th Cong., 2d Sess. 59 (1920) (testimony of John C. Koons, Assistant Postmaster General). Pursuant to the first collective bargaining agreement between USPS and APWU after passage of the Postal Reorganization Act, 39 U.S.C. §§ 101–5605 (1976 & Supp. V 1981), in 1971 USPS agreed to convert all temporary substitutes into a job classifica-

at 12. It is appellees' actions in changing the calculation of the annuity formula's second component—the average annual salary—that appellants now challenge.

### B. *Justification for the Change in the Method of Computation*

Although it is clear that the hypothetical full-time salary was originally adopted for use in the annuity computation formula as a result of the Comptroller General's ruling under the double compensation statute, it is not clear how its use was originally rationalized. The parties agree, however, that OPM subsequently justified its use on the ground that substitutes were "subject to call." They also agree that OPM justified the change in the formula on the ground that substitutes are no longer "subject to call." This term does not appear in any statute or published regulation, and it has never been defined. The parties agree that it describes working conditions, but because they disagree on precisely what conditions it comprehends, they disagree on whether substitutes are still "subject to call." This disagreement over the nature of the current working conditions of substitutes and whether those conditions render substitutes "subject to call" is the only apparent dispute between the parties.

Over the past eighty years the conditions of postal substitute employment have changed. In the 1890's, it seems, substitutes were required to physically report for duty at the post office ("shape up") two or three times each day. *George M. Gerhauser,* 21 Decisions Relating to Pensions and Annuities 80, 81 (Sec'y of the Interior 1921) (quoting letter of Nov. 26, 1920, from postmaster at Washington, D.C., to Comm'r of

Pensions). By 1918 substitutes were required to "shape up" in the morning and wait for work all day and into the evening. *Civil Service Retirement Act: Hearings on H.R. 11352 Before the House Comm. on Interstate and Foreign Commerce,* 65th Cong., 2d Sess. 68 (1918) (reprinting statement of Thomas F. Flaherty, Secretary-Treasurer, National Federation of Post-Office Clerks). By the 1940's, at least, substitutes were required merely to be available by telephone if needed to work on short notice. Deposition of Deputy Postmaster General James V.P. Conway 33–36, Joint Appendix (J.A.) at 31–34. By the mid-1970's, after passage of the Postal Reorganization Act, substitutes—now called "part-time flexible" employees [5]—still had to be available to work on short notice. Agreement Between USPS and APWU § 8, at 9 (July 21, 1975 to July 20, 1978) (employees may be "requested or scheduled" to work), J.A. at 137. The 1975 collective bargaining agreement between USPS and APWU gave PTF's a "guaranteed tour of duty"; that is, they would be guaranteed a minimum of either two or four hours' pay each time they were called in to work. *Id.,* J.A. at 137.

The parties' disagreement over the meaning of "subject to call" stems not only from appellees' failure ever to define "subject to call" but also from appellees' failure to set out clearly why they believe PTF's are no longer "subject to call." Initially, OPM justified the change by noting that PTF's "are not 'subject to call' on a full time basis as postal substitutes had been in the past. Instead, they work under a 'guaranteed tour of duty' of 2 or 4 hours per pay period. . . ." CSC Bureau of Retirement, Insurance, and Occupational Health (BRIOH), Letter No. 10–12 (Oct. 16, 1978), J.A. at 103. This

---

tion covered by civil service retirement. *See* note 5 *infra.* These newly covered employees would receive service credit for years of work during which they did not contribute to the civil service retirement fund, and therefore, the civil service retirement fund would suffer an "unfunded liability" on their account. In 1974 Congress provided that USPS would henceforth be liable for any unfunded liabilities resulting from labor-management agreements increasing postal workers' pay. 5 U.S.C. § 8348(h)(1) (Supp. V 1981). Pursuant to 5

U.S.C. § 8348(h)(2), OPM furnished USPS with the $150 million estimate of its liability. We intimate no view on the correctness of OPM's determination of USPS's liability.

5. Neither this change in terminology nor the 1973 reclassification of former "temporary substitutes" as "part-time flexibles," *see* note 4 *supra,* affects our analysis of the issues in this case. We will refer to all former substitutes as "PTF's."

statement suggests that PTF's ceased being "subject to call" when they acquired the guaranteed tour of duty, but appellees also seem to claim that substitutes ceased being "subject to call" when they were no longer required to "shape up." Brief for Appellees at 3, 5–6, 9, 15, 18–19. Appellees have also attempted to justify the change on the ground that PTF's need no longer even be available on short notice because they are "told in advance of both the days and the times they [are] expected to work." Brief for Appellees at 6.

Appellants sharply disagree with appellees' various reasons for believing that PTF's are not "subject to call." They contend that the "guaranteed tour of duty" simply assures that when PTF's are called in to work, they will receive a guaranteed minimum number of paid hours of work. Brief for Appellants at 24–26; *see* Affidavit of James V.P. Conway, Deputy Postmaster General, ¶ 5, Appellees' Appendix (A.A.) at 6. Since the guaranteed tour does not affect the availability requirement, they assert, the guaranteed tour could not itself constitute elimination of the "subject to call" requirement. Appellants seem to agree with appellees that "shaping up" is comprehended by the term "subject to call," but they vehemently disagree that once PTF's were no longer required to "shape up" they ceased being "subject to call." According to appellants, "subject to call" also comprehends the requirement that PTF's be available to work on short notice, a requirement which they allege is still enforced, contrary to appellees' assertions. Brief for Appellants at 22–24.

## II. ANALYSIS

### A. *Standard of Review*

The standard for our review of the district court's grant of summary judgment is clear:

In reviewing the propriety of a summary judgment, it is our responsibility to determine whether there was any issue of fact pertinent to the ruling and, if not, whether the substantive law was correctly applied. . . . Thus, to be upheld, the summary judgment under review must withstand scrutiny on both its factual and legal foundations.

*Bloomgarden v. Coyer,* 479 F.2d 201, 206–07 (D.C.Cir.1973). Since the materiality of any disputed factual issues can be determined only in reference to specific legal contentions, we turn now to a discussion of appellants' legal challenges to the new method of annuity computation.

### B. *Appellants' Legal Arguments*

#### 1. The Due Process Claim

■ The facts pertinent to this claim are not disputed. OPM's decision to change the method of computation effective for PTF's retiring after February 11, 1978, was made in January 1978. Notice of the change was given to USPS the same month, but APWU and individual postal workers received constructive notice of the change only in April 1978, when the change was noted in the USPS Employee and Labor Relations Manual. Deposition of James V.P. Conway, Deputy Postmaster General, at 42, J.A. at 37. Appellants argue that appellees' actions in changing the method of annuity computation with no prior notice to the affected PTF's violated their right to due process of law secured by the fifth amendment to the United States Constitution.

Appellants' due process rights are implicated only if appellants had an interest protected by the due process clause.[6] Appellants argue that their interest in annuities computed using the hypothetical full-time salary is a protected property interest. The district court rejected this claim on the ground that a protected property interest in civil service retirement benefits does not

---

**6.** We note that appellants do not claim to have been deprived of benefits derived from their own and USPS's contributions to the civil service retirement fund, which are based on appellants' actual pay. Rather, they claim to have been deprived of the funds that would have been used to supply the difference between the benefits they would have received under the pre-1978 method of calculation and the lower benefits they will receive under the current method.

exist until retirees are "entitled to 'immediate payment under the preexisting law.'" Memorandum, *American Postal Workers Union v. United States Postal Service,* CA 79–0874, at 6 (D.D.C. Sept. 2, 1981) (quoting *Nordstrom v. United States,* 342 F.2d 55, 60, 169 Ct.Cl. 632 (Ct.Cl.1965)). Because none of appellants had applied for retirement benefits by the effective date of the change, the district court reasoned, no appellant on that date had a right to begin receiving an annuity, and thus no appellant had a protected property interest in benefits calculated using the pre-1978 method.

We agree with the district court's conclusion. Appellants, relying on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), allege that on February 11, 1978, PTF's had a "legitimate claim of entitlement," *id.* at 577, 92 S.Ct. at 2709, to annuities calculated using a hypothetical full-time salary. There is no doubt that appellants had an *expectation* of receiving annuities based on the hypothetical full-time salary, an expectation that was perfectly reasonable in light of OPM's fifty-year-old practice of using that method of computation. However, a reasonable expectation does not constitute a property interest.

To have had a property interest in a particular level of benefits, appellants must have been legitimately entitled to benefits at that level. Their entitlement to retirement benefits is determined by the provisions of the Civil Service Retirement Act, 5 U.S.C. §§ 8331–8348 (1976 & Supp. V 1981), the "independent source" that creates and defines property interests in civil service retirement benefits. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Act provides that annuities are available only to employees who have met specific age, service, or disability requirements and who have separated from the service. 5 U.S.C. §§ 8336–8338 (1976 & Supp. V 1981). A retiree who meets these eligibility requirements acquires an interest protected by the due process clause in benefits at the level provided by the law in effect at the time he or she becomes eligible.

■ *Potential* retirees have no protected property interest in any particular level of retirement benefits. A protected interest in retirement benefits arises only at the point when the federal employee actually retires, that is, separates from the service. Federal workers may participate in the retirement system for many years, and over the years the benefits available through that system may be changed in accordance with law. It is therefore necessary that a given employee's interest in an annuity be measured at a particular temporal point. Until the employee becomes eligible for benefits as prescribed by the Act, his or her rights are subject to any lawful changes made to the Act from which the claim to entitlement arises. Here, although some of appellants met the age and service requirements for retirement before February 11, 1978, none had separated from the service. Since the change in the method of annuity computation was made lawfully, as we shall see, and since no appellant had a "legitimate claim of entitlement" to an annuity prior to February 11, 1978, the change in the method of computation did not violate appellants' rights under the due process clause.

### 2. The Postal Reorganization Act Claim

■ The facts material to this challenge are also undisputed. The Postal Reorganization Act (PRA), 39 U.S.C. §§ 101–5605 (1976 & Supp. V 1981), established collective bargaining between USPS and postal employees. *Id.* §§ 1201–1209. Pursuant to the PRA, employee-management relations are governed by provisions of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151 *et seq.* (1976), "to the extent not inconsistent with provisions of" the PRA. 39 U.S.C. § 1209 (1976). Two provisions of the PRA relevant to this controversy are subsections (d) and (f) of 39 U.S.C. § 1005 (1976). Subsection (d) of section 1005 provides that postal employees shall be covered by the civil service retirement system. Subsection (f) provides: (1) that postal employees will retain the "[c]ompensation,

benefits, and other terms and conditions of employment in effect immediately prior to the effective date" of the PRA until they are lawfully changed by USPS; (2) that "[n]o variation, addition, or substitution with respect to fringe benefits shall result in a program of fringe benefits which on the whole is less favorable to the officers and employees than fringe benefits in effect on the effective date" of the PRA; and (3) that "no such variation, addition, or substitution [in fringe benefits] shall be made except by agreement between the collective-bargaining representative and the Postal Service."

Appellants argue that USPS violated subsection (f) of section 1005 by procuring the change in the annuity computation method. They reason that annuities calculated using the hypothetical full-time salary were part of the "compensation, benefits, and other terms and conditions of employment" existing on the effective date of the PRA to which PTF's were entitled unless those benefits were lawfully changed by USPS. The reduction in retirement benefits, appellants contend, could only have been effected through collective bargaining and then only if other benefits were gained so that the package of benefits as a whole remained as favorable to employees as the benefits existing on the effective date of the PRA. Appellants conclude that because USPS did not bargain with the postal employees' unions over the change and because the resulting reduction in PTF annuities was not offset by any gain in benefits, the change infringed section 1005(f). In addition, appellants contend that OPM violated subsection (f)'s requirement that no change in employment benefits can be less favorable to employees than those existing on the effective date of the PRA.

The district court rejected appellants' PRA challenge, reasoning that the commands of subsection (f) are limited by the provision of subsection (d) that postal workers are covered by the civil service retirement law. Subsection (d)'s specific reference to civil service retirement, in the district court's view, controls subsection (f)'s general reference to "compensation, bene-

fits, and other terms and conditions of employment"; thus, retirement benefits are not encompassed by subsection (f) and are not subject to collective bargaining. Moreover, the district court noted, the PRA's legislative history reveals both Congress's awareness that changes might be made in the civil service retirement law and its intention that postal workers be subject to those changes; Congress contemplated only that postal workers be able to bargain for retirement benefits in addition to those provided by the civil service retirement law. Memorandum, *American Postal Workers Union v. United States Postal Service,* CA 79–0874, at 10 (D.D.C. Sept. 2, 1981), J.A. at 13.

Our review of the PRA and its legislative history convinces us that the district court's conclusion is correct. We begin from the following proposition: because the NLRA requires private employers to bargain with employees about retirement benefits, *Inland Steel Co. v. NLRB,* 170 F.2d 247, 251–55 (7th Cir.1948), *cert. denied,* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949), USPS, by virtue of 39 U.S.C. §§ 1201–1209, must bargain with postal workers about retirement benefits unless relieved of that duty by another provision of the PRA. *Id.* § 1209. We note that the PRA provides retirement benefits to postal workers under a subsection completely separate from the one providing that changes in "compensation, benefits, and other terms and conditions of employment" must be collectively bargained. Purely as a matter of statutory construction, the specific provision in section 1005(d) for civil service retirement coverage controls the general reference to "compensation, benefits, and other terms and conditions of employment" in section 1005(f). *See generally* 2A C. Sands, *Statutes and Statutory Construction* § 46.05, at 57 (4th ed. 1973).

This canon of statutory construction is buttressed here by the unreasonable result rendered by a contrary construction. Subsection (f) provides that postal workers' "benefits" cannot be changed without collective bargaining. The only governmental

entity having a duty to bargain collectively under the PRA is USPS, yet USPS has absolutely no control over the substance or administration of the civil service retirement act, to which postal workers are subject under subsection (d). Thus, if we were to adopt appellants' view of the PRA, we would require USPS to bargain with postal workers about a benefit that USPS can neither grant nor deny, increase nor decrease. Clearly Congress could not have intended such an anomalous result.

Congress's intent in subsections (d) and (f) is, in fact, made clear in the legislative history of the PRA. Members of Congress were concerned about the status of postal employees under the proposed independent USPS. 116 Cong.Rec. 19,853–54 (1970) (remarks of Rep. Scott); id. at 20,227 (remarks of Rep. Olsen); id. at 20,228–29 (remarks of Rep. Sisk). H.R. 17070, the bill that was enacted as the PRA, provided for creation of a "postal career service, which shall be a part of the civil service." H.R. 17070, § 201, 91st Cong., 2d Sess. (1970) (codified at 39 U.S.C. § 1001 (1976)). The effect of this provision, explained Congressman Derwinski, one of the co-sponsors of H.R. 17070, would be to remove postal service employees from the competitive civil service and thereby permit them to bargain over standards governing appointment, promotion, compensation, and adverse action. 116 Cong.Rec. 20,231 (1970). In the view of H.R. 17070's supporters, the postal employees' loss of the protection of the civil service merit system was justified by their anticipated greater opportunity for career development and advancement and their new right to bargain collectively for benefits. Id. at 20,203 (remarks of Rep. Brasco); id. at 20,206 (remarks of Rep. Fulton); id. at 20,208 (remarks of Rep. Tiernan); id. at 20,229 (remarks of Rep. Udall); see 39 U.S.C. § 1001 (1976).

However, USPS employees would not forfeit all the benefits of membership in the civil service. As Congressman Udall, one of the co-sponsors of H.R. 17070, explained, with the creation of USPS the PRA in effect "created a new kind of Federal employee." 116 Cong.Rec. 20,229 (1970). Postal workers would henceforth be hybrid employees, with some of the rights and benefits of federal employees and some of the rights and benefits of private employees, most importantly, the right to bargain collectively. Id. (remarks of Rep. Udall). Congressman Udall pointed out that postal employees' "federal" benefits would continue to be controlled by Congress, while those benefits over which Congress relinquished control would be set through collective bargaining. The three federal benefits over which Congress retained control are retirement, veteran's preference, and workers' compensation. The rights and benefits to be set by collective bargaining include hiring and promotion, health and life insurance, pay, and disciplinary action. Id. at 20,230 (remarks of Rep. Udall); see 39 U.S.C. § 1005(a)(1)(A), (a)(2), (c), (d) (1976)).

Congressman Derwinski noted on the floor of the House that one of the exceptions to the postal workers' right to bargain collectively is their coverage by the civil service retirement law. Id. at 27,602. In addition, when asked what effect the proposed bill would have on postal employees,[7] the Comptroller General replied, "With the exception of ... retirement benefits, which would continue to be provided under the civil service retirement program ..., all compensation, benefits and other terms and conditions of employment would be determined ... through collective bargaining. ..." Letter from Comptroller General Keller to Hon. William L. Scott (Mar. 31, 1970), reprinted in H.R.Rep. No. 1104, 91st Cong., 2d Sess. 67–69 (1970), U.S.Code Cong. & Admin.News 1970, p. 3649, 3710 (supplemental views of Congressman William L. Scott); accord · Postal Reform:

---

7. The Comptroller General's comment was directed to H.R. 4, a postal reorganization bill very similar to H.R. 17070 that was introduced earlier in the same Congress. The material employment provisions of H.R. 17070 were identical to the provisions of H.R. 4 discussed by the Comptroller General. Compare H.R. 4, 91st Cong., 1st Sess. §§ 803(c), 804, with H.R. 17070, 91st Cong., 2d Sess. §§ 203(c), 204.

*Hearings on H.R. 17070 and Similar Bills Before the House Comm. on Post Office and Civil Service,* 91st Cong., 2d Sess. 93 (1970) (testimony of Francis S. Filbey, President, United Federation of Postal Clerks); *id.* at 97 (remarks of Rep. Brasco). Permeating the PRA's legislative history is Congress's understanding that USPS employees' benefits would be partially provided by each of two separate and mutually exclusive systems: collective bargaining and the civil service system. Thus, we conclude that USPS had no duty to bargain over the change in the annuity computation method because Congress did not intend to include civil service retirement benefits within the subsection (f) benefits that can be changed only through collective bargaining.

Appellants also argue that, apart from any collective bargaining requirement, OPM could not lawfully change the method of computing PTF annuities. Appellants assert that the retirement benefits in effect when the PRA was passed, which were computed using the hypothetical full-time salary, were part of the benefit "floor" provided by subsection (f), which no government agency can reduce. Reply Brief for Appellants at 2 n. 2. It is clear to us, however, that the benefit floor provided by subsection (f) was intended merely to continue in effect the pay and benefits enjoyed by postal employees under the Post Office Department until pay and benefits could be set through collective bargaining with the newly created USPS. H.R.Rep. No. 1104, 91st Cong., 2d Sess. 10, 21–22 (1970). Logically, therefore, the benefit floor includes only those benefits within the scope of collective bargaining. *See* 116 Cong.Rec. 20,231 (1970) (remarks of Rep. Derwinski); *Postal Reform: Hearings on H.R. 17070 and Similar Bills Before the House Comm. on Post Office and Civil Service,* 91st Cong., 2d Sess. 20 (1970) (testimony of Postmaster General Blount). Since retirement benefits are not subject to collective bargaining, they are not part of the benefit floor provided by subsection (f). Thus, the PRA provides no guaranteed minimum level of PTF annuities, and OPM did not violate

subsection (f) by changing the computation formula.

Our conclusion that Congress provided neither collective bargaining over civil service retirement benefits nor a guaranteed minimum level of retirement benefits is reinforced by the House committee report on H.R. 17070. The committee noted that postal employees would be "covered by the Civil Service retirement program, as that program may from time to time be changed by law," H.R.Rep. No. 1104, 91st Cong., 2d Sess. 28 (1970), indicating that under the PRA postal workers' retirement benefits would be subject to the vicissitudes of the law governing the civil service retirement system. In addition, the committee's statement that postal workers can bargain for *supplemental* retirement benefits, *id.,* underscores the bill's exclusion of civil service retirement benefits from the collective bargaining required by subsection (f). We therefore agree with the district court that appellees did not transgress the PRA in changing the method of annuity computation.

### 3. The Civil Service Retirement Act Claim

Appellants have not vigorously asserted this claim, *see* Brief for Appellants at 1, 41; therefore, we address it only briefly. The undisputed facts are as follows: The change in the annuity computation method was originally announced in an unpublished CSC minute (Minute 7) on January 12, 1978. J.A. at 208. By its terms, Minute 7 applied only to PTF's working in third-class post offices—approximately 13,000 of the 113,000 PTF's employed by USPS. However, on October 16, 1978, the Bureau of Retirement, Insurance, and Occupational Health (BRIOH) expanded use of the new method of computation to cover the additional 100,000 PTF's employed in first- and second-class post offices. BRIOH, Letter No. 10–12, at 1 (Oct. 16, 1978), J.A. at 103. In doing so, appellants contend, BRIOH violated the Civil Service Retirement Act, 5 U.S.C. §§ 8331–8348 (1976 & Supp. V 1981), by usurping the authority of the CSC to administer the Act.

There is no doubt that when the change in the annuity computation method was made, CSC alone had the right to administer the Act. 5 U.S.C. § 8347(a) (1976). Through its own regulations, however, CSC delegated some administrative authority to BRIOH, reserving to itself the authority to approve "basic policies affecting the administration of the retirement . . . laws." A.A. at 22. In Minute 7 CSC established a policy of using actual pay as the basis for calculating the annuities of PTF's who were no longer "subject to call." It is clear from the record that USPS represented to CSC that *all* PTF's, not just those in third-class post offices, were no longer "subject to call" and thus no longer entitled to annuities based on a hypothetical full-time salary. *See* Memorandum from D.M. Mikules to Craig Pettibone (CSC May 24, 1978), J.A. at 143; Letter from James V.P. Conway, Deputy Postmaster General, to Thomas A. Tinsley, Director, BRIOH, at 2 (Aug. 4, 1977), J.A. at 203. Therefore, BRIOH reasonably could have applied this policy in calculating the annuities of PTF's in first- and second-class post offices, who, according to USPS, were also no longer "subject to call." In any case, this expanded application of the annuity computation policy established in Minute 7 has been ratified by OPM in its brief before this court. We therefore hold that BRIOH's action in applying the annuity computation formula to all PTF's in October 1978 did not violate the Civil Service Retirement Act.

### 4. The Administrative Procedure Act Claim

■ Finally, appellants contend that OPM's admitted failure to follow notice and comment procedures in changing the method of annuity computation violated the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1976). Appellees respond by arguing that the change is exempt from the informal rulemaking provisions of the APA because it is an interpretative rule exempted by section 553(b)(A).[8] It is in connection with this claim that the materiality of the dispute over the working conditions of PTF's becomes an issue.

#### a. *Characterization of the Rule*

Appellees assert that at most the rule is interpretative, while appellants argue that the rule is legislative because it conclusively affects the substantive rights of a large number of postal employees. The district court held that the new method of annuity computation was an interpretative rule and was therefore exempt from section 553 rulemaking requirements. Memorandum, *American Postal Workers Union v. United States Postal Service*, CA 79–0874, at 6, 10 (D.D.C. Sept. 2, 1981), J.A. at 9, 13. We agree with the district court's conclusion.

■ The first step in deciding the nature of a rule is to ascertain whether the rule can possibly be legislative. A rule can be legislative only if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue. *Joseph v. United States Civil Service Commission*, 554 F.2d 1140, 1153 & n. 24 (D.C.Cir.1977). Because appellants have not identified a particular statutory provision as the source of OPM's alleged power to promulgate legislative rules, we assume that appellants believe the new rule to have been promulgated pursuant to 5 U.S.C. § 8347(a). That section grants to OPM the general power to "administer" the Civil Service Retirement

---

8. Appellees also contend that the change is not a rule at all. The APA defines a "rule" very broadly, in relevant part as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (1976). We believe that the change in the annuity computation formula, as announced in Minute 7 and BRIOH Letter No. 10–12, is a statement having future effect that both prescribes and implements OPM's policy of no longer using a hypothetical full-time salary in calculating PTF annuities. The new PTF annuity computation formula is therefore a "rule." In light of our holding that the rule is interpretative and thus exempt from § 553 rulemaking requirements, *see* pp. 559–560 *infra*, we need not address appellees' further contention that the rule is exempt because it relates to personnel or benefits under 5 U.S.C. § 553(a)(2).

Act and to "prescribe such regulations as are necessary and proper to carry out" the Act. 5 U.S.C. § 8347(a) (Supp. V 1981).

We find it unnecessary, however, to decide whether OPM could promulgate legislative rules under section 8347(a), for it is clear that in this case OPM did not intend to exercise any delegated legislative power. *See* 2 K. Davis, *Administrative Law Treatise* § 7:9, at 42 (2d ed. 1979); *id.* § 7:11, at 54. OPM has denied that it intended to promulgate a legislative rule. Brief for Appellees at 26–28. While an agency's characterization of its own action is not conclusive, *Citizens to Save Spencer County v. United States Environmental Protection Agency,* 600 F.2d 844, 879 n. 171 (D.C.Cir. 1979); *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir.1972), an objective examination of the context of the rule indicates that OPM's characterization accurately reflects its intent.

First, the origin of the pre-1978 method of computation indicates that it was not intended to be a legislative rule. Although the 1926 retirement act contained a provision in pertinent part very similar to present section 8347, Act of July 3, 1926, ch. 801, § 17, 44 Stat. 904, 913; *see* 5 U.S.C. § 8347 (1976) (historical and revision note on substitution of language), the Secretary of the Interior apparently did not rely on his power to make rules and regulations when instituting use of the hypothetical full-time salary. Instead, he appears merely to have interpreted the term "average annual basic salary" in the retirement law in conformity with the Comptroller General's interpretation of the term "salary per annum" in the double compensation statute. *See* p. 551 *supra.* Thus, the annuity computation formula originated as an interpretation of the retirement act.

Second, the new rule does not "fill in the gaps" in a complicated regulatory scheme. *Cf. Citizens to Save Spencer County v. United States Environmental Protection Agency,* 600 F.2d 844, 879 (D.C.Cir.1979) (agency rules filling breach in directives of Clean Air Act were legislative). Instead, the rule deals with an aspect of the Civil

Service Retirement Act already prescribed in detail by Congress—the method of computing retirees' annuities. Congress has prescribed a basic formula for computing a retiree's benefits, 5 U.S.C. § 8339(a)(1)–(3) (1976), and has prescribed other formulas for various specific classes of employees, including Members of Congress, congressional employees, and employees of the Panama Canal Company, *id.* § 8339(b), (c), (d)(2) (1976 & Supp. V 1981). Congress has defined both the computation factors to be used: "total service," *id.* §§ 8332(a), 8331(12) (1976), and "average pay," which is derived from "basic pay," *id.* § 8331(3)–(4). Although Congress did not prescribe a special computation formula for PTF's, it did define "total service" for PTF's to include periods during which they did not actually work. *Id.* § 8332(b)(1) (1976 & Supp. V 1981).

Within this detailed statutory framework, OPM has calculated the "average pay" for workers who are "subject to call" to include pay the employees did not actually earn. This practice is nothing more than an interpretation of the statutory term "average pay," *see* Brief for Appellees at 31; that is, in OPM's view, Congress intended that employees working under certain conditions receive the benefit of annuities computed using an enhanced "average pay" figure. In changing the PTF annuity computation formula, OPM merely interpreted the term "average pay" as applied to PTF's to include only pay actually earned. Thus, the new rule meets the classic definition of an interpretative rule: it is a "statement[ ] as to what the administrative officer thinks the statute or regulation means." *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C. Cir.1952).

Appellants argue that the new rule conclusively affects the retirement rights of thousands of PTF's and is therefore a legislative rule. The cases cited by appellants do not support their contention. In *Batterton v. Marshall,* 648 F.2d 694 (D.C.Cir.1980), this court reviewed a change in the Department of Labor's method of measuring unemployment for the purpose of allocating

CETA funds to the states. We noted that the change would have a substantial impact on a state's right to receive CETA funds. However, our decision that the new method was a legislative rule rested on the fact that the Department of Labor had exercised the power delegated to it by the CETA statute "to prescribe rules with the force of law concerning the development of unemployment statistics." *Id.* at 705 (footnote omitted). Similarly, in *Joseph v. United States Civil Service Commission,* 554 F.2d 1140 (D.C.Cir.1977), our decision that a CSC rule exempting certain political activities from coverage under the Hatch Act was a legislative rule was based not on the rule's impact but rather on the fact that it was promulgated pursuant to a specific delegation of legislative power in the governing statute. *Id.* at 1153. The Fifth Circuit's decision in *Brown Express, Inc. v. United States,* 607 F.2d 695 (5th Cir.1979), is also inapposite. There, the Fifth Circuit examined an ICC rule's impact on the motor carrier industry solely in order to decide whether it was a "rule of agency procedure" exempted from notice and comment requirements by 5 U.S.C. § 553(b)(A). *Id.* at 701–03. Despite its finding of substantial impact, the Fifth Circuit expressly refused to find that the rule was legislative. *Id.* at 700 n. 5.

■ As Professor Davis has noted, the impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals. 2 K. Davis, *Administrative Law Treatise* § 7:8, at 39 (2d ed. 1979). Thus, the substantial impact of the new rule on the retirement rights of 113,000 future retirees does not transform it into a legislative rule. As an interpretative rule, the new annuity computation formula is exempt from the rulemaking requirements of the APA, and OPM therefore did not act unlawfully in promulgating it without notice and comment proceedings.

b. *Review of the Rule*

■ Having characterized the rule as interpretative, we must now review it. In doing so we are not bound by the agency's determination since an interpretative rule, unlike a legislative rule, does not have the force of law. *Joseph v. United States Civil Service Commission,* 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977). Instead, we review the interpretative rule to determine its consistency with the governing statute and regulations. Although we may defer to the agency interpretation, we are free to substitute our own judgment for that of the agency in determining the propriety of the rule. *Id.; see* 2 K. Davis, *Administrative Law Treatise* § 7:13, at 59 (2d ed. 1979).

We are convinced that the new method of annuity computation is a proper interpretation of the Civil Service Retirement Act. Before explaining this conclusion, we emphasize the precise parameters of our review. The parties have framed their discussion largely in terms of whether OPM lawfully determined that PTF's are no longer "subject to call," and the single disputed factual issue in this case is whether PTF's are in fact no longer "subject to call." In essence, appellants' argument is as follows: The new annuity computation formula represents a change in OPM's policy, which it justified on the basis that the working conditions of PTF's have changed and they are no longer "subject to call." Whatever the change in the working conditions of PTF's between the late 1920's and the 1960's, their working conditions did not change between the 1960's and 1978. Since in 1960 PTF's were entitled to annuities based on a hypothetical full-time salary, they must then have been "subject to call." Because their working conditions have not changed, they must still be "subject to call" and therefore entitled to the higher annuities.

The "subject to call" issue, however, is a mirage. The question here is not whether PTF's are "subject to call." Because OPM has never defined "subject to call," it would be impossible for OPM to test a retiree's right to an enhanced annuity by whether that employee was "subject to call." "Subject to call" is not a legislatively defined category that limits OPM's interpretation

of the Act; rather, it is merely an umbrella term that describes the working conditions of employees whom OPM believes Congress intended to benefit through use of an enhanced "average pay" figure. *See* Brief for Appellees at 27.

Viewing OPM's interpretation in this light, it is clear that appellants cannot prevail simply by proving that the working conditions of PTF's have not changed since 1960. OPM could have changed its interpretation of the Act for any reason. *See American Chicle Co. v. United States,* 316 U.S. 450, 454–55, 62 S.Ct. 1144, 1146, 86 L.Ed. 1591 (1942); *Aberdeen & Rockfish Railroad Co. v. United States,* 682 F.2d 1092, 1099–1100 (5th Cir.1982); *Baker v. United States,* 614 F.2d 263, 267, 222 Ct.Cl. 263 (Ct.Cl.1980). In contrast to agency decisions made pursuant to adjudication and legislative rulemaking, interpretative rules may be sustained on grounds other than those assigned by the agency. *See* K. Davis, *Administrative Law Text* § 16:07, at 329 (3d ed. 1972) (*Chenery* rule that agency action must stand or fall on its own rationale not applicable to actions that courts are as competent as agencies to take, such as interpreting a statute). The persuasiveness of an agency's reasons for reaching a particular interpretation, however, might affect the degree of deference we accord its views in the course of our own independent evaluation of the law's meaning. Therefore, if the agency's consideration of factors peculiarly within its expert knowledge would be useful to us in determining the correct interpretation of the law and if the agency's reasoning reveals an inadequate consideration of the proper factors, we may decline to make an independent evaluation at once and, instead, remand to the agency for further consideration. A remand is not

appropriate in this case, however, since the expertise that OPM can bring to bear in this context would not illuminate the legal issue before us. *See* note 9 and p. 562 *infra.*

The parties' dispute over the nature of the present working conditions of PTF's and whether those conditions render PTF's "subject to call" is therefore immaterial. Even if appellants could prove at trial that the working conditions of PTF's have not changed over the past twenty years and that PTF's are as available as appellants claim, this proof would at most undermine OPM's justification for the change in its interpretation. It would not affect the propriety of the interpretation itself, which is a pure question of law. To prevail in this case appellants would have to show the impropriety of OPM's new method of annuity computation by showing Congress's intention that PTF annuities be computed using a hypothetical full-time salary. This they have not done. We turn now to our reasons for believing that OPM's new method of annuity computation is a correct interpretation of the Civil Service Retirement Act.

■ In essence we are faced with a choice between two conflicting interpretations of the Act made by the agency charged with its administration. A reviewing court may accord varying degrees of deference to an agency's interpretation of a statute. *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); *see* 2 K. Davis, *Administrative Law Treatise* § 7:13, at 60 (2d ed. 1979). Here, our review of the factors that determine the degree of deference we should give to an agency interpretation leads us to give no deference to either interpretation.[9]

**9.** First, neither annuity computation formula was developed contemporaneously with the retirement act. *See Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). The pre-1978 rule originated in 1928, eight years after the first act and two years after the 1926 revision of the act. Furthermore, the original computation formula was not an independent construction of the act by its administrator.

*See* p. 551 *supra.* Likewise, the new rule did not accompany a revision or re-enactment of the act and so cannot be a contemporaneous interpretation of statutory language. Second, the new rule is not longstanding, having been promulgated just five years ago. *See United States v. Leslie Salt Co.,* 350 U.S. 383, 395–96, 76 S.Ct. 416, 423–424, 100 L.Ed. 441 (1956). Although the old annuity computation formula was longstanding, its long life cannot overcome

The plain language of the Act makes it clear that Congress did not intend for a PTF's "average pay" to include pay which the PTF never earned—neither on the basis of the employee's being "subject to ·call" nor on any other basis. There is no statutory provision for an enhanced "average pay" figure for employees working under certain conditions. "Average pay" is defined as "the largest annual rate resulting from averaging an employee's or Member's rates of basic pay in effect over any 3 consecutive years of creditable service." 5 U.S.C. § 8331(4) (1976). "Basic pay" is defined to include certain specified "pay," *id.* § 8331(3)(A)–(D), and to exclude, *inter alia,* "bonuses, allowances, overtime pay, military pay," *id.* § 8331(3).

Although the definition of "basic pay" does not expressly limit the term to pay actually earned, Congress's intention to do so is clear. From 1926 to 1956, the salary component of the annuity computation formula was "the average annual basic salary, pay, or compensation *received*" by the employee. Act of July 3, 1926, ch. 801, § 4, 44 Stat. 904, 907 (emphasis added); Act of May 29, 1930, ch. 349, § 4, 46 Stat. 468, 471; Act of Feb. 28, 1948, ch. 84, § 4, 62 Stat. 48, 49. The "received" language was omitted

in the 1956 act, when a definitional section was added to the act. Civil Service Retirement Act Amendments of 1956, Pub.L. No. 854, § 401, 70 Stat. 736, 743. The 1956 act marked the first appearance of separate definitions for "average salary" and "basic salary," with the former defined as deriving from the latter. The sponsor of S. 2875, which was "embodied" in the 1956 act, 102 Cong.Rec. 13,670–71 (1956) (remarks of Sen. Johnston), noted on the Senate floor that the new definitions were not intended to change the meanings of terms "except as specifically noted in the report on the bill." *Id.* at 8655. The report on the bill by the Senate Committee on Post Office and Civil Service indicates no relevant change in the meanings of "average salary" or "basic salary." S.Rep. No. 1787, 84th Cong., 2d Sess. 10 (1956). That Congress intended the term "basic salary" still to mean only money actually received is shown by the report on the enacted bill, H.R. 7619, which states that the act defined "average salary" to require "that the annuities of all officers and employees . . . be based on an annual average of salary *received.*" S.Rep. No. 2642, 84th Cong., 2d Sess. 5 (1956) (emphasis added), U.S.Code Cong. & Admin.News

our conviction that it is not as correct an interpretation of the Act as the new rule. *See Securities & Exchange Comm'n v. Sloan,* 436 U.S. 103, 117–18, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); *Aberdeen & Rockfish R.R. v. United States,* 682 F.2d 1092, 1099–1100 (5th Cir.1982).

Third, neither rule required the exercise of agency expertise. *See Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977). The administration of the retirement law does not involve the type of technical expertise so necessary in the administration of a *regulatory* statute. *Cf. A.G. Becker, Inc. v. Board of Governors,* 693 F.2d 136, 140 (D.C.Cir.1982) (regulation of commercial banking). The degree of specificity with which Congress set out the annuity computation formulas in the statute indicate that the administrator's authority to vary the plain meaning of the prescribed formulas is very narrow. *Cf. id.* at 140 (scope of Federal Reserve Board's authority is broad). Fourth, our deference is not mandated by "the thoroughness evident in [the] consideration" of either the old or the new rule, nor by the "validity of [the agency's] reasoning" in adopting either of them. *See*

*Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Although the consideration given to adoption of the old rule is blurred by the mists of time, it seems that consideration was given largely, and perhaps entirely, to the Comptroller General's construction of a similar term in an unrelated statute. *See* p. 551 *supra.* The Secretary of the Interior apparently reasoned that similar terms in different statutes had to be interpreted identically. We do not find this reasoning sufficiently persuasive to engender deference to the Secretary's interpretation. OPM's consideration of the new rule also was less than compellingly thorough, encompassing no solicitation of information from APWU and no independent investigation of the representations of USPS. Deposition of Dorothy Mikules at 42, J.A. at 100. Furthermore, the reasoning underlying the new rule was fuzzy, *see generally* pp. 552–553 *supra,* and, according to appellants, was based on an erroneous view of the facts. Thus, neither of these factors would call forth deference to the new rule. *Cf. A.G. Becker, Inc. v. Board of Governors,* 693 F.2d 136, 140–41 (D.C. Cir.1982) (factors counsel great deference).

1956, p. 3725, 3728. The change in terminology from "salary" to "pay" was made in 1966, when various federal personnel laws were codified and enacted as title 5 of the United States Code. Act of Sept. 6, 1966, Pub.L. No. 89–554, 80 Stat. 378. Congress did not intend the change in terms to effect any change in meaning. H.R.Rep. No. 901, 89th Cong., 1st Sess. 1 (1965).

Additional evidence that "basic pay" includes only pay actually earned is found in other sections of the Act. The statute commands that each employing agency "shall deduct and withhold 7 percent of the basic pay of an employee" for contribution to the retirement fund. 5 U.S.C. § 8334(a)(1) (1976). Also, in defining "unfunded liability," the statute refers to "deductions to be withheld from the future basic pay of employees." *Id.* § 8331(19)(A) (1976 & Supp. V 1981). Similarly, section 8342(h) refers to "[a]mounts deducted and withheld from the basic pay of an employee." *Id.* § 8342(h) (1976). Obviously, deductions cannot be made from pay to which the employee never becomes entitled, such as the hypothetical pay a PTF would have earned if he or she had worked during the time he or she was available for work. Since Congress clearly intended "basic pay" to mean money actually received, from which deductions could be made and contributed to the retirement fund, Congress could not have intended hypothetical pay to be included in "average pay."

In addition, the Act's provision for enhanced service credit for PTF's demonstrates that Congress knew how to reward PTF's with increased annuities when it so desired. Since 1926, when Congress responded to the plight of substitutes who had to remain at the post office all day awaiting work, PTF's have received service credit for hours during which they do not actually work. Thus, PTF's already benefit from use of a greater-than-actual figure as the service component of the annuity computation formula. The omission of any sim-

ilar provision in the Act for allowing salary credit for pay not actually earned is strong evidence of Congress's intent.

The history and structure of the Act also support our construction. The legislative history bristles with Congress's concern about the cost of the civil service retirement system to the federal government. *E.g.,* H.R.Rep. No. 1844, 84th Cong., 2d Sess. 46–48 (1956); 102 Cong.Rec. 8547–49 (1956) (remarks of Sen. Johnston); 59 Cong. Rec. 2503–08 (1920) (colloquy between Senators Pomerene and Sterling); *id.* at 2549–56 (remarks of Sen. Pomerene). In the 1920 act Congress rejected both noncontributory and wholly contributory retirement schemes, choosing instead to enact a partially contributory system. 59 Cong.Rec. 2503, 3395 (1920) (remarks of Sen. Sterling). Under this system, civil service retirement benefits are financed primarily through deductions from employees' pay, and any deficit between employee contributions and benefits payable is satisfied with federal funds.[10] Congress intended for federal employees and the federal government to share equally in the cost of retirement benefits. S.Rep. No. 1787, 84th Cong., 2d Sess. 2, 3 (1956). The principle underlying this scheme is proportionality between employee contributions and retirement benefits. Congress has declared that one of the "essentials to proper financing of the retirement fund" is "employee contributions to the fund in amounts related to benefits provided." H.R.Rep. No. 2935, 84th Cong., 2d Sess. 33 (1956) (Conference Report), U.S. Code Cong. & Admin.News 1956, p. 3743. Maintenance of this proportionality requires the maintenance of proportionality between employees' actual contributions to the retirement fund and the service and salary credits included in the annuity computation formula. 5 U.S.C. § 8334(c), (d) (1976 & Supp. V 1981) (deposit of contributions to fund required before service credit may be allowed); 67 Cong.Rec. 9708–11 (1926) (colloquy on the Senate floor) (credit for service in legislative branch not allowed unless

---

**10.** Since 1956 the federal government's share of retirement benefits has been financed chiefly through contemporaneous payment of a per-

centage of each employee's basic pay to the retirement fund. *See* 5 U.S.C. § 8334(a)(1) (1976).

appropriate contribution made to fund). The pre-1978 method of PTF annuity computation violates the basic principle underlying the Act by allowing salary credit for pay from which no contribution to the retirement fund has been made. As a result, the federal government has had to bear a disproportionate share of the cost of PTF annuities, clearly contrary to Congress's intent.

Moreover, the old annuity computation method often resulted in a retiree's receiving more in retirement benefits than he or she received in pay while employed. *See* Retirement Records of Wilma M. Carter and Accompanying Affidavit of Craig Pettibone, Chief of OPM Office of Policy Development and Technical Services, J.A. at 219–52. In the Act Congress explicitly provided an annuity ceiling of eighty percent of an employee's "average pay." 5 U.S.C. § 8339(f)(1) (1976). One of the primary purposes of the retirement act is to encourage workers to remain in federal service. 102 Cong.Rec. 8657 (1956) (remarks of Sen. Johnston); *id.* at 8551–52 (remarks of Sen. Lehman); 94 Cong.Rec. 1743 (1948) (remarks of Sen. Baldwin). The eighty-percent annuity ceiling is clearly intended to avoid giving workers the retirement incentive of enabling them to receive more money after they retire than while they were working. By including unearned pay in the "average pay" figure, the old rule subverts Congress's intent by granting some retirees annuities in excess of their actual earnings while employed. The new rule neither encourages disproportionality between contributions and benefits nor rewards federal workers for retiring. It therefore better effectuates Congress's intent than did the old rule.

Moreover, the pre-1978 rule does not benefit from the presumption of congressional approval via re-enactment of the statute with no change in the interpreted language. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). Re-enactment is a useful aid to discovering the intent of Congress, but it is not a conclusive indicator of congressional intent. *Helvering v. Reynolds,* 313 U.S.

428, 432, 61 S.Ct. 971, 973, 85 L.Ed. 1438 (1941). Although the retirement act was re-enacted three times following adoption of the old annuity computation method in 1928—in 1930, 1948, and 1956—we find these re-enactments insufficiently indicative of congressional approval to overcome our reading of the statute and its legislative history, which is inconsistent with the pre-1978 interpretation.

One might expect Congress's attention to have been drawn to the Secretary's 1928 interpretation of "average salary" when the retirement law was completely revised and re-enacted in 1930, but there is absolutely no indication in the legislative history of the 1930 act that Congress knew about the use of a hypothetical full-time salary in computing substitutes' annuities, much less approved of it. The histories of the 1948 and 1956 retirement acts, as well as the 1970 Postal Reorganization Act, reveal a similar lack of congressional awareness of the old annuity computation formula. The Supreme Court has held that even when Congress knows, by virtue of a committee report, of the administrative interpretation, re-enactment of a statute with no change in the relevant language is insufficient to validate the interpretation in the face of its inconsistency with the plain language of the act. *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 119–22, 98 S.Ct. 1702, 1712–1713, 56 L.Ed.2d 148 (1978). We therefore decline to accept Congress's re-enactment of the retirement law with no awareness of the old annuity computation formula as an indication of congressional approval.

The new computation formula is consistent with the plain meaning of the term "average pay" in the Civil Service Retirement Act. It is also consistent with the Act's structure and purpose. We therefore hold that OPM's present PTF annuity computation method is a proper interpretation of the Act.

### c. *Voluntary Rulemaking*

Even though OPM was not compelled to engage in notice and comment rulemaking

before changing the PTF annuity computation method,[11] in our view rulemaking would have been advisable. The change struck at a very sensitive area: the pocketbooks of federal retirees. By directly reducing the annuities PTF's can expect to receive, the change threatened the employees' financial planning and economic security. The change overturned fifty years of administrative practice, and in the view of PTF's, unfairly eliminated the quid pro quo for their availability, on which they had relied in continuing to work for USPS. In addition, PTF's received no notice of the change, and this omission heightened the perception of unfairness.

Of course, agencies are free to adopt administrative procedures in excess of those required by the APA. Courts may encourage agencies to engage in voluntary rulemaking whenever public participation would be beneficial to the administrative process. "Public rulemaking procedures increase the likelihood of administrative responsiveness to the needs and concerns of those affected. And the procedure for public participation tends to promote acquiescence in the result even when objections remain as to substance." *Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.,* 589 F.2d 658, 662 (D.C.Cir.1978). Certainly, this is a case in which rulemaking might have facilitated understanding and acceptance of the change by those whom it adversely affected.

### III. CONCLUSION

We have held that the only factual dispute in this case—the nature of PTF working conditions and whether those conditions render PTF's "subject to call"—is immaterial to resolution of the legal issues. We have also held that because the actions of USPS and OPM in changing the PTF annuity computation formula did not violate the due process clause of the fifth amendment, the Postal Reorganization Act, the Civil Service Retirement Act, or the Administrative Procedure Act, appellees were entitled to judgment as a matter of law. The judgment of the district court is therefore

*Affirmed.*

---

11. Appellants argue that we should require rulemaking in this case as a matter of fairness. Brief for Appellants at 41–42. We decline to require OPM to engage in procedures not required by the APA. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).