The NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM; The United States Trust Company; and The Women's Division of the Board of Global Ministries of the United Methodist Church, Plaintiffs,

v.

SECURITIES AND EXCHANGE COMMISSION, Defendant.

No. 93 Civ. 1233 (KMW).

United States District Court, S.D. New York.

Jan. 19, 1994.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

On October 15, 1993, the court issued an Order enjoining defendant Securities and Exchange Commission ("SEC") from issuing any no-action letter in which the SEC takes a position at variance with the understanding of the "ordinary business operations" exception adopted by the SEC on November 22, 1976, until such time as the SEC adopts such a position in a rule-making proceeding pursuant to public notice and comment. The court's factual and legal findings are set forth below.

Plaintiffs challenge a change in the SEC's enforcement policy concerning whether shareholders can require companies to include in their proxy materials shareholder proposals regarding equal employment opportunity matters. Plaintiff New York City Employees' Retirement System ("NYCERS") asked Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") to include in its 1992 proxy material a proposal that Cracker Barrel implement an employment policy prohibiting discrimination on the basis of sexual orientation. NYCERS submitted its proposal in response to an announcement by the company of a policy of discrimination in employment against gay men and lesbians.[1] Cracker Barrel sought the SEC's views on the company's intention to omit

---

1. The Cracker Barrel policy was announced in a January 1991 press release, in which the company stated:

Cracker Barrel is founded upon a concept of traditional American values, quality in all we do, and a philosophy of 100% guest satisfaction. It is inconsistent with our concept and values, and is perceived to be inconsistent with those of our customer base, to continue to employ individuals in our operating units whose sexual preferences fail to demonstrate normal heterosexual values which have been the foundation of families in our society.

Therefore, it is felt this business decision is in the best interests of the company.

SEC Ex. D at 2. Following the issuance of this press release, Cracker Barrel fired several employees solely because of their sexual orientation. In response to protests, Cracker Barrel rescinded its anti-gay policy. However, NYCERS maintains, and Cracker Barrel does not deny, that the individuals fired were not rehired. Cracker Barrel reiterated its commitment to equal employment opportunities, but failed to include sexual orientation as a criterion on which it would not discriminate. *Id.* at 2–4; 12–13. The purpose of

NYCERS' proposal from its proxy material. The SEC advised Cracker Barrel that it would not bring an enforcement action against Cracker Barrel for excluding NY-CERS' proposal, because the proposal dealt with matters relating to Cracker Barrel's "ordinary business operations" pursuant to SEC Rule 14a–8(c)(7).[2] The SEC stated that it had reconsidered its past position, which viewed employment policies and practices that were tied to a significant social issue as outside of the "ordinary business operations" exception. The SEC announced that, because it had become increasingly difficult to identify those employment-related proposals that were includable by virtue of their social

policy implications, all employment-based shareholder proposals that did not involve senior executives or directors could thereafter be excluded as relating to a company's ordinary business operations.[3] *See Cracker Barrel Old Country Stores, Inc.*, 1992 WL 289095, 1992 SEC No–Act. LEXIS 984 (Oct. 13, 1992) (*"Cracker Barrel "*). In announcing this new position, the SEC reversed the position that it had taken consistently as recently as two years earlier. For example, in 1990, the SEC advised AT & T that AT & T could not omit a proposal that the company eliminate its affirmative action programs. *See AT & T,* 1990 SEC No–Act. LEXIS 20 (Jan. 5, 1990).

the NYCERS proposal is to expand Cracker Barrel's antidiscrimination policy to include sexual orientation.

2. Rule 14a–8(c)(7) permits a corporation to exclude a shareholder's proposal if the proposal "deals with a matter relating to the conduct of the ordinary business operations of the registrant." 17 C.F.R. § 240.14a–8(c)(7) (1993).

3. The letter reads in full:

The Proposal requests that the Board of Directors implement hiring policies relating to sexual orientation and incorporate such policies into the corporate employment policy statement.

The Company contends that the proposal is excludable pursuant to Rule 14a–8(c)(7). As a general rule, the staff views proposals directed at a company's employment policies and practices with respect to its non-executive workforce, to be uniquely matters relating to the conduct of the company's ordinary business operations. Examples of the categories of proposals that have been deemed to be excludable on this basis are: employee health benefits, general compensation issues not focused on senior executives, management of the workplace, employee supervision, labor-management relations, employee hiring and firing, conditions of employment and employee training and motivation.

Notwithstanding the general view that employment matters concerning the workforce of the company are excludable as matters involving the conduct of day-to-day business, exceptions have been made in some cases where a proponent based an employment-related proposal on "social policy" concerns. In recent years, however, the line between includable and excludable employment-related proposals based on social policy considerations has become increasingly difficult to draw. The distinctions recognized by the staff are characterized by many as tenuous, without substance and effectively nullifying the application of the

ordinary business exclusion to employment-related proposals.

*The Division has reconsidered the application of Rule 14a–8(c)(7) to employment-related proposals in light of these concerns and the staff's experience with these proposals in recent years. As a result, the Division has determined that the fact that a shareholder proposal concerning a company's employment policies and practices for the general workforce is tied to a social issue will no longer be viewed as removing the proposal from the realm of ordinary business operations of the registrant. Rather, determinations with respect to any such proposals are properly governed by the employment-based nature of the proposal.*

This is to be distinguished from proposals relating to the compensation of senior executives and directors. The Commission continues to regard issues affecting CEO and other senior executive and director compensation as unique decisions affecting the nature of the relationships among shareholders, those who run the corporation on their behalf and the directors who are responsible for overseeing management performance. Consequently, unlike proposals relating to the rank and file workforce, proposals concerning senior executive and director compensation are viewed by the Commission as inherently outside the scope of normal or routine practices in the running of the company's operations.

Accordingly, it is the Division's view that the instant proposal may be excluded from the Company's proxy material in reliance upon Rule 14a–8(c)(7).

*Cracker Barrel Old Country Stores, Inc.,* 1990 WL 289095, *18–19, 1992 SEC No–Act. LEXIS 984, *1–2 (Oct. 13, 1992) (emphasis added). The full Commission reviewed and affirmed the Division of Corporate Finance's position, *see* 17 C.F.R. §§ 202.1–202.2, in a letter dated January 15, 1993 from the Secretary of the SEC to Deputy Counsel, Officer of the Comptroller of New York City. Complaint Ex. B.

Plaintiffs are institutional investors that routinely submit employment-related proposals to companies in which they own stock. Complaint ¶¶ 7–11. They challenge the validity of the SEC's position in *Cracker Barrel*, claiming that in issuing and affirming the no-action letter, the SEC announced a new rule without first complying with the notice and comment procedures of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 (1977). Even if the SEC was not required to comply with the notice and comment provisions, plaintiffs allege, the position is arbitrary and capricious and may not be enforced. *See* 5 U.S.C. § 706(2)(A). For the reasons stated below, the court finds that the *Cracker Barrel* position is a legislative rule that can be adopted only in a rule-making proceeding pursuant to public notice and comment. The court does not reach the question of whether the SEC action was arbitrary and capricious.

## Background

Much of the historical and regulatory background of shareholders' right to submit proposals for inclusion in a corporation's proxy material is recounted in this court's opinion in *Amalgamated Clothing & Textile Workers Union v. Wal–Mart Stores, Inc.,* 821 F.Supp. 877, 881–83 (S.D.N.Y.1993) ("*ACTWU*"), and will be noted here only briefly. The SEC, rather than Congress, has been primarily responsible for the development of the shareholder proposal right under the proxy rules. The SEC was the first to conclude that a shareholder proposal rule was necessary in order to prevent proxy material from being misleading if such materials failed to disclose that shareholders intended to raise certain proposals at the annual meeting. *See id.* at 882 (citing authorities); Securities and Exchange Commission Division of Corporate Finance, *Staff Report on Corporate Accountability: A Re-examination of Rules Relating to Shareholder Communications, Shareholder Participation in the Corporate Electoral Process and Corporate Governance Generally,* 96th Cong.2d Sess. (Comm. Print) (Comm. on Banking, Housing and Urban Affairs of the U.S. Senate), at 144–45 & n. 32 (1980).

SEC Rule 14a–8(a) requires a company to include a shareholder's proposal in the company's proxy statement. *See* 17 C.F.R. § 240.14a–8(a).[4] This rule, adopted in 1942, established the communication and franchise rights of shareholders to receive information about proposals submitted by fellow stockholders in advance of the annual meeting and to cast a vote on those proposals by proxy. In 1953, the SEC proposed adding to the rule several grounds for excluding proposals, including "[i]f the proposal consists of a recommendation or request that management take action with respect to a matter relating to the conduct of the ordinary business operations of the issuer." The Commission explained that this ground for exclusion "relieve[s] management of the necessity of including in its proxy material security holder proposals which relate to matters falling within the province of management...." Securities Exchange Act Release No. 4950 (Oct. 20, 1953); 18 Fed.Reg. 6646, 6647 (1953). After a notice and comment period, the SEC adopted the amendment in 1954. The "ordinary business operations" exception was codified as Rule X–14a–8(c)(5). *See* Securities Exchange Act Release No. 4979 (Jan. 14, 1954); 19 Fed.Reg. 246, 247 (1954).

---

**4.** A company that wishes to omit a proposal from its proxy material must file with the SEC (1) a copy of the proposal, (2) any statement in support of the proposal submitted by the proponent, and (3) a statement explaining why the proposal may be excluded. *See* 17 C.F.R. § 240.14a–8(d). The SEC need not pre-approve a company's exclusion of a proposal before the proxy material is distributed. Also, the SEC does not respond to every company's request for a no-action letter. *See ACTWU,* 821 F.Supp. at 883.

The SEC has explained that "the sole purpose of staff review and comment with respect to proxy matters, including stockholder proposals, is to promote compliance with the proxy rules and to assist both management and the Commission in avoiding the possibility of unnecessary litigation between them." *Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals,* Securities Exchange Act Release No. 12599, [1976–77 Transfer Binder] *Fed.Sec.L. Reports* ¶ 80,635, at 86,-602–86,603 (July 7, 1976). Over the many years that the SEC has been issuing no-action letters stating its enforcement position, these letters have had a substantial impact in causing parties to conform their conduct to the SEC's understanding of the securities laws.

In 1976, the SEC again proposed amendments to Rule 14a–8 and to the ordinary business operations exception. After more than twenty years of experience with the exception, the Commission concluded that the ordinary business operations exception "frequently has been relied upon by issuers to exclude proposals that involve matters of considerable importance to the issuer and its security holders." *Proposed Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders,* Securities Exchange Act Release No. 12,598 (July 7, 1976); 41 Fed.Reg. 29,-982, 29,984 (1976) (*"Proposed 1976 Amendments"*). To remedy this perceived flaw, the SEC proposed deleting subparagraph (c)(5) and replacing it with a new subparagraph (c)(7) that would provide a basis for excluding a proposal "[i]f the proposal deals with a routine, day-to-day matter relating to the conduct of the ordinary business operations of the issuer." *Id.* The SEC also proposed an alternative formulation: "[i]f the proposal deals with a matter that the governing body of the issuer (such as the Board of Directors) is not required to act upon pursuant to the applicable State law or the issuer's governing instruments (such as the Charter or By-Laws)." *Id.* The Commission invited comment on which formulation, if any, the SEC should adopt. After studying the comments it received, the SEC concluded that although an "ordinary business operations" exception should be retained, both of the proposed formulations would be difficult to administer. *See Adoption of Amendments Relating to Proposals by Security Holders,* Securities Exchange Act Release No. 12,999 (Nov. 22, 1976); 41 Fed.Reg. 52,994, 52,997 (1976) (*"Adoption of 1976 Amendments"*). In lieu of these proposed formulations, the SEC chose a modified version of the 1954 language. The amendment that was adopted took the form of a facially insignificant change; the new language permits exclusion of a proposal if it "deals with a matter relating to the conduct of the ordinary business operations of the issuer."[5] *Id.* at 52,998. However, the SEC simultaneously explained that notwithstanding the similarity between the old and new rules, the amended rule was intended to signal an SEC shift in position and that it would henceforth prohibit exclusion of proposals involving substantial policy considerations, even if they otherwise could be said to deal with "ordinary business operations." The SEC explained its decision as follows:

> ... the provision adopted today can be effective in the future if it is interpreted somewhat more flexibly than in the past. Specifically, the term "ordinary business operations" has been deemed on occasion to include certain matters which have significant policy, economic or other implications inherent in them. For instance, a proposal that a utility company not construct a proposed nuclear power plant has in the past been considered excludable under former subparagraph (c)(5).[6] In retrospect, however, it seems apparent that the economic and safety considerations attendant to nuclear power plants are of such magnitude that a determination whether to construct one is not an "ordinary" business matter. Accordingly, *proposals of that na-*

---

**5.** The relevant text of 14a–8(c) adopted in 1976 is as follows:

(c) The registrant may omit a proposal and any statement in support thereof from its proxy statement and form of proxy under any of the following circumstances:

....

(7) If the proposal deals with a matter relating to the conduct of the ordinary business operations of the registrant.

17 C.F.R. § 240.14a–8(c) (1993). This text replaced the prior rule, which provided:

(c) Notwithstanding the foregoing, the management may omit a proposal and any statement in support thereof from its proxy statement and form of proxy under any of the following circumstances:

....

(5) If the proposal consists of a recommendation or request that the management take action with respect to a matter relating to the conduct of the ordinary business operations of the issuer.

17 C.F.R. § 240.14a–8(c) (1974).

**6.** The SEC referred to *Potomac Electric Power Co.,* SEC No–Action Letter, 1976 WL 11005, *9, 1976 SEC No–Act. LEXIS 622, *3 (Mar. 5, 1976) (permitting exclusion of the proposal because it relates to the mundane business matters of the utility's fuel mix and electrical generating methods).

*ture as well as others having major implications, will in the future be considered beyond the realm of an issuer's ordinary business operations, and future interpretive letters of the Commission's staff will reflect that view.*

*.... Thus, where proposals involve business matters that are mundane in nature and do not involve any substantial policy or other considerations, the subparagraph may be relied upon to omit them.*

*Id.* at 52,998 (emphasis added). In this release, the SEC acknowledged that *all* proposals could be seen as involving some aspect of ordinary business operations; however, a proposal could not be excluded on that basis unless it raised no substantial policy consideration. *See ACTWU,* 821 F.Supp. at 890.

From 1976 until 1992, the SEC and its staff applied the standard articulated in the *Adoption of 1976 Amendments* to shareholder proposals pertaining to companies' equal employment opportunity policies. On at least seven occasions from 1978 through January 1992, the SEC staff took the position that proposals urging companies to adopt equal employment opportunity policies with respect to their employees in Northern Ireland and South Africa could not be excluded in reliance on Rule 14a–8(c)(7). *See Dow Chemical Company,* 1979 WL 13828, *12, 1978 SEC No–Act. LEXIS 788, *6–*7 (Mar. 1, 1978); *Dresser Industries, Inc.,* 1984 WL 15214, *7, 1980 SEC No–Act. LEXIS 2647, *6 (Jan. 3, 1980); *Texaco, Inc.,* 1984 WL 48457, *18, 1984 SEC No–Act. LEXIS 1846, *3–*4 (Feb. 28, 1984); *Texaco, Inc.,* 1985 WL 54029, *18, 1985 SEC No–Act. LEXIS 1885, *6–*7 (Mar. 15, 1985); *TRW, Inc.,* 1986 WL 67666, *6, 1986 SEC No–Act. LEXIS 1661, *1–*2 (Jan. 28, 1986); *Mobil Oil Corp.,* 1990 SEC No–Act. LEXIS 167, *1–*2 (Feb. 7, 1990); *Mobil Oil Corp.,* 1992 SEC No–Act. LEXIS 43, *1–*2 (Jan. 14, 1992).

Also during this period, the SEC advised AT & T three times that it could *not* rely on the ordinary business operations exception to exclude a proposal to phase out the company's affirmative action policies designed to benefit individuals from any particular racial or ethnic group. *See AT & T,* 1988 WL 233967, 1988 SEC No–Act. LEXIS 118 (Jan. 25, 1988); *AT & T,* 1988 WL 235275, 1988 SEC No–Act. LEXIS 1703 (Dec. 21, 1988); *AT & T,* 1990 WL 285826, 1990 SEC No–Act. LEXIS 20 (Jan. 5, 1990). The proposal was submitted by the National Alliance, a white supremacist organization that a court had found advocates the "violent expulsion and separation" of racial, religious or ethnic groups from society in order to protect against "black savagery" and "jewish manipulation." *AT & T,* 1988 WL 235275, *2, 1988 SEC No–Act. LEXIS 1703, *7–*9 (Dec. 21, 1988), *quoting National Alliance v. United States,* 710 F.2d 868, 871–73 (D.C.Cir.1983).[7]

Then on October 13, 1992, the SEC staff issued the *Cracker Barrel* no-action letter. The SEC stated that Cracker Barrel could rely on the "ordinary business operations" exception to exclude NYCERS' proposal that Cracker Barrel adopt a nondiscrimination policy with respect to sexual orientation. On January 15, 1993, the full Commission affirmed the staff no-action letter to Cracker Barrel. Complaint Ex. B. Since then, the SEC staff has followed its new position in at least six no-action letters, all of which involved types of proposals as to which the SEC had, in the past, taken a contrary position. *See, e.g., Mobil Oil Corp.,* 1993 WL 31685, 1993 SEC No–Act. LEXIS 168 (Feb. 4, 1993) (extension of affirmative action program to include Vietnam war veterans); *United Technologies Corp.,* 1993 WL 48821, 1993 SEC No–Act. LEXIS 288 (Feb. 19, 1993) (adoption of "MacBride Principles" opposing employment discrimination on the basis of religion at companies with operations in Northern Ireland); *Unisys Corp.,* 1993 WL 48814, 1993 SEC No–Act. LEXIS 270 (Feb. 19, 1993) (same); *GTE Corp.,* 1993 WL 54309, 1993 SEC No–Act. LEXIS 322 (Feb. 25, 1993) (information about company's equal

---

**7.** It should be noted that not all proposals involving equal employment opportunity and affirmative action issues were deemed includable as relating to a substantial policy consideration. Prior to *Cracker Barrel,* the SEC had shifted its position on proposals requesting affirmative ac-

tion data and reports. *See ACTWU,* 821 F.Supp. at 887–88. Early no-action letters stated that such proposals must be included, but in 1991 the SEC apparently decided that they were too mundane to require inclusion under the substantial policy consideration rule. *Id.*

employment opportunity and affirmative action policies); *Wal–Mart Stores, Inc.,* 1993 WL 107958, 1993 SEC No–Act. LEXIS 584 (Mar. 26, 1993) (same).

The SEC maintains in its memorandum of law in this case that, in issuing the *Cracker Barrel* no-action letter, it "determined no longer to apply the 1976 interpretation to employment-related proposals." Memorandum of Law in Support of Motion by Defendant Securities and Exchange Commission to Dismiss the Complaint or, in the Alternative, For Summary Judgment ("SEC Brief") at 38 n. 21; Memorandum of Law of the Securities and Exchange Commission (1) in Opposition to Plaintiffs' Cross–Motion for Summary Judgment and (2) in Further Support of the Commission's Motion for Dismissal and Summary Judgment ("SEC Reply Brief") at 14–15 n. 7. For nonemployment-related proposals, the SEC appears still to adhere to the standard it articulated in 1976. SEC Br. at 38 n. 21; *Grimes v. Ohio Edison Co.,* 992 F.2d 455, 457 (2d Cir.), *cert. denied* —— U.S. ——, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993). Thus, the current SEC position is that shareholders have no right of access to management's proxy material to communicate with one another on employment-related proposals involving rank and file employees, even where such proposals involve substantial policy considerations. This case raises the issue not fully addressed in *ACTWU* [8]—with which procedures must the SEC comply before it can substitute a new standard for the one it announced in 1976? Plaintiffs argue that the procedures required are the public notice and comment provisions of the APA.

### Discussion

The SEC offers four arguments for dismissing plaintiffs' complaint and entering summary judgment in favor of the SEC.[9] First, the SEC argues that plaintiffs are seeking review of its determination not to commence an enforcement action against Cracker Barrel, which is a determination that is not subject to judicial review. Second, the SEC claims that plaintiffs have an adequate alternative legal remedy in court in the form of a suit directly against a corporation that refuses to include their proposal, and that the existence of such an alternative remedy precludes a cause of action under the APA. Third, the SEC argues that even if its actions are reviewable, the position embodied in *Cracker Barrel* is an interpretive, rather than legislative, rule, and thus is not subject to the notice and comment procedures of the APA. Finally, the SEC asserts that the position expressed in *Cracker Barrel* is not arbitrary or capricious. Plaintiffs challenge the SEC's characterization of their claims and argue that the SEC errs in its reading of the decisions construing the APA. The court addresses the SEC's arguments in turn.

### I. Availability of Judicial Review.

The APA specifically exempts from judicial review those agency [10] actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has held that an agency's decision not to prosecute parties or enforce laws within its authority "is a decision generally committed to an agency's absolute discretion," because these decisions are generally unsuitable for judicial review. *Heckler v. Chaney,* 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In *Chaney,* the Supreme Court held that prisoners on death row could not sue to compel the Food and Drug Administration ("FDA") to commence an enforcement action against two States using drugs allegedly not approved for use in human executions. The SEC argues that *Chaney* disposes of this case, because there is no source of statutory

---

**8.** The *ACTWU* case presented a dispute between shareholders and Wal–Mart Stores, Inc., in which the shareholders sought to enjoin the issuer's omission of their proxy proposal. The SEC was not a party and its rule-making procedures were not directly challenged. Accordingly, the questions presented by the present case, although potentially implicated in *ACTWU,* were not before the court in that case. *See* discussion of other adequate remedies at Part II, *infra.*

**9.** The parties cross-move for summary judgment; there are no factual disputes that preclude the entry of judgment. *See* Fed.R.Civ.P. 56(c).

**10.** The SEC is an "agency" for the purposes of the APA. *See* 5 U.S.C. § 551(1).

guidance to aid the court in determining whether it was proper for the SEC not to commence an enforcement action against Cracker Barrel. Thus, the SEC argues, its enforcement position is unreviewable.

The SEC mischaracterizes plaintiffs' claims. Plaintiffs here do not seek an order directing the SEC to commence an enforcement action against Cracker Barrel or any other corporation to whom the SEC subsequently issued a no-action letter restating the language of *Cracker Barrel.* Rather, plaintiffs claim that in the course of advising Cracker Barrel that the SEC would not commence an enforcement action against it if it excluded NYCERS' proposal, the SEC announced a new rule pertaining to an entire category of shareholder proposals without first following the public notice and comment requirements imposed by the APA. As is discussed below, NYCERS' challenge to a rule making is distinguishable from the attack on an enforcement decision involved in *Chaney.*

■ As a threshold matter, in order to determine whether plaintiffs have successfully distinguished *Chaney,* the court must determine whether the no-action letter to Cracker Barrel announced a "rule" that could be subject to notice and comment requirements. The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. § 551(4). *Cracker Barrel* contains statements of general applicability about how the employment-related proposal at issue was viewed by the SEC and how the SEC intends to treat a broad range of similar proposals in the future. The court finds that the SEC's position as stated in *Cracker Barrel* is a rule within the APA's broad definition of that term. *See American Postal Workers Union v. United States Postal Service,* 707 F.2d 548, 558 n. 8 (D.C.Cir.1983), *cert. denied,* 465 U.S.

1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984); *Batterton v. Marshall,* 648 F.2d 694, 700 (D.C.Cir.1980).[11]

■ Having concluded that the *Cracker Barrel* position is a rule, the court considers whether it may review the rule even though the rule was adopted in the context of an agency's determination whether to exercise its prosecutorial discretion. In determining the availability of judicial review, courts since *Chaney* have explicitly noted the distinction between the reviewability of an agency's decision not to take an enforcement action, and the reviewability of an agency's "pronouncement of a new statutory interpretation in an opinion explaining the nonenforcement decision...." *International Union, United Auto., Aerospace & Agric. Implement Workers of America v. Brock,* 783 F.2d 237, 239 (D.C.Cir.1986) ("*Int'l Union* "). In *Int'l Union,* the union filed an administrative complaint with the Department of Labor ("DOL"), alleging that Kawasaki Motor Corporation and others attempted to thwart the union's organizing drives and then failed to report the corporation's activities to the DOL as required by § 203 of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"). *See id.* at 241. In declining to prosecute Kawasaki, the DOL based its enforcement position in part on its determination that the LMRDA does not require reporting of the two practices alleged in the administrative complaint. *See id.* at 242–43. The Court of Appeals held that *Chaney* barred review of DOL's decision not to take enforcement action against Kawasaki, but that nothing in *Chaney* precluded review of the agency's statutory interpretation announced in its opinion explaining the enforcement decision. *Id.* at 245. The opinion reasoned that "when a legal challenge focuses on an announcement of a substantive statutory interpretation, courts are emphatically qualified to decide whether an agency has acted outside the bounds of reason." *Id.*[12] The

**11.** The SEC does not concede that the *Cracker Barrel* position is a "rule" for purposes of the APA, but cites no authority for the proposition that the *Cracker Barrel* position is not a rule. Rather, the SEC argues that to the extent the *Cracker Barrel* position is a rule, it is an interpretive, rather than legislative rule. SEC Br. at 35

n. 20. The court considers this argument in Part III, *infra.*

**12.** In *Int'l Union,* Judge Wald noted that *Chaney* "itself left open the possibility that review might be available even for a nonenforcement decision if that decision is predicated solely on the agen-

court of appeals remanded the case to the district court to consider whether the challenged statutory interpretations were arbitrary, capricious or otherwise contrary to law. *See id.* at 239.

The distinction recognized in *Int'l Union* between the enforcement decision itself and a substantive statutory interpretation propounded in the context of that decision has been relied upon by the Ninth Circuit, as well as other panels of the D.C. Circuit. *See Montana Air Chapter No. 29 v. Federal Labor Relations Authority,* 898 F.2d 753, 756, 758 (9th Cir.1990) (*Chaney* poses no bar to judicial review of a new interpretation of the Labor–Management Relations Act announced in a decision refusing to issue unfair labor practice complaint); *Edison Electric Institute v. U.S. EPA,* 996 F.2d 326, 333 (D.C.Cir.1993) (finding EPA's "Enforcement Policy Statement" reviewable because petitioners challenged EPA's interpretation of statute and its implementing regulations, and not "the manner in which the EPA has chosen to exercise its enforcement discretion"); *Nat'l Wildlife Federation v. U.S. EPA,* 980 F.2d 765, 772–73 (D.C.Cir.1992) (*Chaney* is inapplicable because plaintiff raises a facial challenge to the EPA's statutory interpretation and does not contest a particular enforcement decision). The SEC has cited no decision that rejects the logic of *Int'l Un-*

*ion.*[13] To accept the SEC's argument that the *Cracker Barrel* rule is shielded from judicial review because it is contained in a no-action letter would, as noted by the D.C. Circuit Court of Appeals, hand agencies "carte blanche to avoid review by announcing new interpretations of statutes only in the context of decisions not to take enforcement action." *Int'l Union,* 783 F.2d at 246. The court rejects the SEC's argument and concludes that the court may review the rule announced by the SEC in its *Cracker Barrel* no-action letter.

## II. Other Adequate Remedy in Court.

■ The SEC also argues that plaintiffs' action against it must be dismissed because the APA requires plaintiffs to pursue an alternate remedy where one is available. The APA states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA also states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. From the face of the statute, in order for a cause of action against a third party to be an adequate, alternative remedy to redress an injury caused by the agency, that cause of action

cy's interpretation of a statute," for the simple reason that "the court has law to apply in determining whether the agency erred." *Int'l Union,* 783 F.2d at 245 n. 10, *citing Heckler v. Chaney,* 470 U.S. 821, 833 n. 4, 105 S.Ct. 1649, 1656 n. 4, 84 L.Ed.2d 714 (1985).

**13.** The SEC argues that the Second Circuit Court of Appeals has impliedly rejected the distinction stated in *Int'l Union* between enforcement decisions and interpretations announced in enforcement decisions. This court disagrees. In *Marlow v. U.S. Dept. of Educ.,* 820 F.2d 581, 582–83 (2d Cir.1987) (*per curiam*), *cert. denied,* 484 U.S. 1044, 108 S.Ct. 780, 98 L.Ed.2d 866 (1988), the court of appeals affirmed the district court's refusal to review the determination made by the Department of Education ("DOE") that Mr. Marlow was not an "otherwise qualified handicapped individual," because no "reasonable accommodation" could be made to permit him to perform his job in light of his psychiatric disorder. The DOE investigated the allegations contained in Mr. Marlow's administrative complaint and issued a determination dismissing his dis-

crimination charge. In issuing that determination, however, the DOE simply found no discrimination under the facts of the case; the DOE did not articulate any rule interpreting the Rehabilitation Act of 1973 for the purposes of review under the APA, and Mr. Marlow did not argue that the DOE had announced a new interpretation of the statute. Rather, he claimed that he could rebut the DOE's finding that his handicap prevents him from performing the essential functions of a teacher. Thus, *Marlow* is factually distinguishable from this case, because *Marlow* did not involve the articulation of a rule. For the *Int'l Union* principle of judicial review to apply, an agency must announce a new rule. For example, in *Montana Air Chapter No. 29,* 898 F.2d at 757–58, the district court held that *Int'l Union* did not apply because the Federal Labor Relations Authority issued no new statutory interpretation when it explained its non-enforcement decision. The court of appeals rejected the district court's finding that no new statutory interpretation had been issued and proceeded to review the new position.

would have to offer the plaintiff a remedy for the injury caused by the agency.[14] The SEC asserts that plaintiffs' true concern is getting their proposals included in the proxy materials of those companies in which they own stock. Thus, the SEC claims, a suit against each corporation resisting inclusion of plaintiffs' proposals would provide an alternative, adequate remedy for plaintiffs' injury that bars judicial review of the SEC's action under the APA.

The SEC's argument relies on an erroneous view of the injury plaintiffs are alleging here. Plaintiffs are not complaining that Cracker Barrel omitted NYCERS' proposal in 1992 and will do so again this year. That issue was before another judge in this court [15] and was before the district court in Tennessee.[16] Rather, in this action, plaintiffs complain that they have been deprived of their right to participate in rule-making proceedings required under § 553 of the APA prior to adoption of a legislative rule affecting their interests.[17] For reasons stated below, the court finds that plaintiffs have no adequate alternative remedy for the claim they raise here.

■ Section 553 of the APA provides in relevant part that "(b) [g]eneral notice of proposed rule making *shall* be published in the Federal Register" and "(c) . . . the agency *shall* give interested persons an opportunity to participate in the rule making." 5 U.S.C. §§ 553(b)–(c) (emphasis added). In enacting what is now § 553, Congress sought

to promote two goals by requiring agencies to follow the notice and comment provisions. First, Congress sought "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *American Hospital Assn. v. Bowen,* 834 F.2d 1037, 1044 (D.C.Cir.1987) (citations and internal quotation marks omitted). Second, Congress sought "to assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Id.; see also White v. Shalala,* 7 F.3d 296, 303 (2d Cir.1993); *Alcaraz v. Block,* 746 F.2d 593, 612 (9th Cir.1984).

In *Air Transport Ass'n v. DOT,* 900 F.2d 369 (D.C.Cir.1990), *vacated on other grounds,* 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991), the D.C. Circuit aptly summarized the importance of the public participation rights secured by the APA:

> Section 553's notice and comment requirements are essential to the scheme of administrative governance established by the APA. These procedures reflect Congress' judgment that . . . informed administrative decisionmaking requires that agency decisions be made only after affording interested persons an opportunity to communicate their views to the agency. Equally important, by mandating openness, explanation, and participatory democracy in the rule-making process these procedures as-

---

14. The Supreme Court explained that the purpose of the "other adequate remedy" provision was to avoid duplication of the "special and adequate" statutory review procedures Congress had established prior to 1946 to review the actions of certain agencies such as the Federal Communications Commission, National Labor Relations Board and Interstate Commerce Commission in regional courts of appeal and specially-constituted three-judge district courts. *See Bowen v. Massachusetts,* 487 U.S. 879, 901–03 & n. 37, 108 S.Ct. 2722, 2736–37 & n. 37, 101 L.Ed.2d 749 (1988). *See also Defenders of Wildlife v. Administrator, EPA,* 882 F.2d 1294 (8th Cir.1989); U.S. Dept. of Justice, *Attorney General's Manual on the Administrative Procedures Act* 101 (1947).

15. *See New York City Employees' Retirement System v. Cracker Barrel Old Country Store, Inc.,* No. 93 Civ. 6354 (CBM).

16. *See Cracker Barrel Old Country Store, Inc. v. New York City Employees' Retirement System,* No. 3–93.0475.

17. For the limited purpose of deciding the threshold question of whether plaintiffs must pursue an alternative remedy for their injury, the court accepts plaintiffs' characterization of the *Cracker Barrel* rule as a legislative rule, subject to notice and comment requirements of the APA. *See Bowen v. Massachusetts,* 487 U.S. at 907 n. 43, 108 S.Ct. at 2739 n. 43 (finding that, as a threshold matter, prior to adjudication of the merits, no adequate alternative remedy exists for a whole category of claims, even if in particular case, adequate alternative remedy might be identifiable after analysis of the merits). In part III, *infra,* the court scrutinizes the merits of plaintiffs' contention.

sure the legitimacy of administrative norms.

900 F.2d at 375 (internal quotations omitted). Rejecting arguments similar to the SEC's position in this case, the *Air Transport* court concluded that "the public *does* have a legitimate interest in participating in agency decisions affecting statutory and constitutional rights...." *Id.* at 377. NYCERS claims that the *Cracker Barrel* letter constituted a legislative rule, substantially affecting their proposal inclusion rights under the securities regulations. Accordingly, they claim a right to participate in rule-making proceedings prior to adoption of that rule. It is vindication of that participation right that plaintiffs seek in this action, and which could not be obtained in any alternative action.

■ Indeed, as the SEC suggests, NYCERS could sue each company that excludes its proposal on the basis of the SEC's new rule. In such actions, courts could refuse to defer to the SEC's *Cracker Barrel* position and therefore order companies to include NYCERS' proposals, because the failure to follow required notice and comment procedures is itself a ground for not enforcing a rule. *See* 5 U.S.C. § 706(2)(D); *see, e.g., ACTWU*, 821 F.Supp. at 890, n. 13. Thus, separate actions against each company excluding NYCERS' proposals could result in separate court orders requiring inclusion of each of those proposals. But no such action could give NYCERS the additional relief they seek here—the opportunity to participate in notice and comment rule-making proceedings prior to implementation of any such rule.[18] The Supreme Court has specifically stated that the adequate alternative remedy provision of the APA does not bar review of agency action where the alleged alternative action could remedy only part of the claimed injury. *Bowen v. Massachusetts*, 487 U.S. at 910 & n. 48, 108 S.Ct. at 2740 & n. 48 ("The District Court's jurisdiction to award complete relief in these cases is not barred by the possibility that a purely monetary judgment may be entered in the Claims Court").

The SEC has cited no decision, and the court can find none, where a claim regarding the right to participate in rule-making proceedings was dismissed on the ground that the plaintiffs had an adequate alternative remedy in the form of a suit against a party other than the agency. The lack of merit in the SEC's argument is illustrated by a decision upon which the SEC relies heavily. SEC Br. at 29–30. In *Hall v. EEOC*, 456 F.Supp. 695 (N.D.Cal.1978), the plaintiffs alleged two causes of action under the APA, claiming two analytically distinct injuries flowing from agency actions. In the first cause of action, the plaintiffs sought judicial review of the adequacy of the EEOC's investigation and conciliation efforts with respect to their administrative complaint. The court dismissed this claim, because it found that a suit under Title VII against plaintiffs' former employers was an adequate alternative remedy under § 704. *See id.* at 700. The plaintiffs also alleged that the EEOC adopted a legislative rule without notice and comment when it adopted the accelerated procedure to investigate discrimination charges, which procedure was used to investigate the plaintiffs' administrative complaints. *See id.* at 701. The district court considered this claim on its merits, and notably did not rely on the existence of an alternative Title VII remedy for all of the plaintiffs' injuries. *See id.* Likewise here, separate private actions against corporations excluding NYCERS' proposals would not provide an adequate alternative remedy to this suit to compel the SEC to put a rule out for notice and comment. *See Bowen v. Massachusetts*, 487 U.S. at 904–05, 108 S.Ct. at 2737–38 (availability of alternative Tucker Act action in Claims Court does not bar review of agency decision that certain state programs do not qualify for federal reimbursement, because Claims Court lacks district court's equitable powers to grant prospective relief).

18. The SEC argues that "a judicial decision carries no less weight because it arises in the context of a suit by a shareholder proponent against the company." SEC Br., at 32. Belying this contention is the SEC's reaction to the *ACTWU* decision, in which this court chose not to defer to the procedurally infirm *Cracker Barrel* letter. In response to the *ACTWU* decision, the SEC has not put the *Cracker Barrel* letter out for notice and comment; and the agency has continued to adhere to the *Cracker Barrel* position in subsequent no action letters.

In addition to *Hall*, the SEC relies on a number of similarly distinguishable cases. Each case cited by the SEC involved the claim that an agency with enforcement or monitoring responsibilities failed to carry out those responsibilities, thereby causing harm to the plaintiffs because a third party was permitted to engage in its discriminatory, or otherwise illegal, activities.[19] In none of these cases did the plaintiff allege that the federal agency adopted a substantive rule in contravention of the APA's procedural notice and comment requirements. Rather, in each of these cases, the plaintiff challenged an agency's enforcement decision. In most of these cases, the remedy plaintiffs sought was continuing supervision of an executive agency by a court, in order to effect the enforcement action plaintiffs sought. *See Council of and for the Blind, Inc.*, 709 F.2d at 1533; *Women's Equity Action League*, 906 F.2d at 747 (refusing "continuing, across-the board federal court superintendence of executive enforcement"). The courts held that plaintiffs could accomplish their desired results as effectively, or more so, through multiple lawsuits against individual defendants.

By contrast, in this case, the court has determined *supra* that the SEC position challenged here by NYCERS is a judicially reviewable rule; NYCERS does not challenge, in this lawsuit, the portion of the *Cracker Barrel* letter that constituted an enforcement decision. Moreover, NYCERS does not seek judicial oversight of SEC policy, but rather, the opportunity to participate in a notice and comment rule-making proceeding regarding the SEC's *Cracker Barrel* position. Thus, the court finds the adequate alternative remedy decisions cited by the SEC inapposite. Although suits against third parties may be adequate to remedy the enforcement-related actions or inactions of agencies, there is no adequate, alternative remedy that can provide effective relief for the claims alleged here, other than a suit against the SEC.[20]

---

**19.** *See Washington Legal Found. v. Alexander*, 984 F.2d 483, 486–87 (D.C.Cir.1993) (private right of action under Title VI of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972 is an adequate, alternative remedy to a suit under the APA to compel the Department of Education to commence a federal fund termination proceeding); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C.Cir. 1990) (same); *Coker v. Sullivan*, 902 F.2d 84, 89 (D.C.Cir.1990) (right of action against States to require adherence to Emergency Assistance plans precludes cause of action under the APA against the U.S. Department of Health and Human Services for failing to monitor and enforce State's compliance); *Olympus Corporation v. United States*, 792 F.2d 315, 320 (2d Cir.1986) (upholding regulation and noting that "[w]hile there may be a difference between exercising administrative discretion on a case-by-case basis to refuse to undertake enforcement actions and promulgating a regulation, ... the latter is not the case here"), *cert. denied* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *Marlow*, 820 F.2d at 583 n. 3 (plaintiff may not sue the Department of Education to reopen its determination of his administrative complaint, because he had a direct remedy against the employer that terminated him under section 504 of the Rehabilitation Act); *Council of & for the Blind, Inc. v. Regan*, 709 F.2d 1521, 1527, 1531 (D.C.Cir.1983) (*en banc*) (dismissing plaintiffs' APA claim against the Office of Revenue, because Congress provided individuals with a statutory right of action against the local governmental authority that was using federal funds to conduct discriminatory programs).

**20.** The SEC argues that only NYCERS has standing to sue under the APA because the other plaintiffs were not proponents of the shareholder proposals mentioned in the Complaint that were deemed excludable by the SEC staff in reliance on *Cracker Barrel*. SEC Br. at 25 n. 12. Moreover, the SEC hints that its adequate alternative remedy analysis of NYCERS' claim may suggest that NYCERS claim, as well as those of the other plaintiffs, may be unreviewable in light of other legal limitations on reviewability, including standing. SEC Br. at 31–2 nn. 17–8.

Indeed, the distinction between the APA's adequate alternative remedy rule and other doctrines limiting reviewability is difficult to define. *See Abbs v. Sullivan*, 963 F.2d 918, 925 (7th Cir.1992) (noting that questions regarding reviewability of agency action, usually "discussed under such murky rubrics as ripeness, prematurity, exhaustion, finality, and standing" might always be framed in terms of statutory interpretation of adequate alternative remedy provision, § 704). The three-part test for standing under Article III requires that:

First, the plaintiff must have suffered an injury in fact.... Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not [be] ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)

The court next considers whether the SEC violated the APA because it did not use notice and comment procedures before adopting a new rule on employment-related proposals in its *Cracker Barrel* letter.

## III. Applicability of APA Notice and Comment Requirements to the *Cracker Barrel* Rule.

Plaintiffs contend that the new rule announced in the *Cracker Barrel* no-action letter was adopted in contravention of the notice and comment requirements of the

(internal quotations omitted). For purposes of challenging agency action, a showing of injury in fact requires demonstration that the plaintiff's interests are within the "'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). For purposes of the "zone of interest" analysis, the relevant statute is the underlying substantive law, not the APA. *Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 937 (Fed.Cir.1991). Thus, a plaintiff may not obtain standing solely on the basis of an alleged procedural harm under the APA, "uncoupled from any injury in fact, or tied only to an undifferentiated injury common to all members of the public." *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C.Cir.1983).

Applying the foregoing legal standards, the court concludes that at least NYCERS, a shareholder within the zone of interests protected by the securities regulations, whose proposal was omitted on the basis of the SEC's *Cracker Barrel* rule, has standing to challenge the SEC's promulgation of that rule. *Compare Capital Legal Found.*, 711 F.2d at 259 (citizens organization lacks standing to challenge rule-making procedures where it was "not governed or materially affected by [regulations]") *with National Treasury Employees Union v. Newman* 768 F.Supp. 8, 10 (D.D.C.1991) (federal employees union has standing to challenge procedures followed in adopting government hiring rules).

The court need not address the SEC's arguments regarding the standing of plaintiffs other than NYCERS. As long as one plaintiff has standing the court may refrain from considering whether the other plaintiffs have standing as well. *See Int'l Union*, 783 F.2d at 246 n. 12, *citing Watt v. Energy Action Educational Found.*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

21. Section 553(b) states in pertinent part:

General notice of proposed rule making shall be published in the Federal Register.... The notice shall include

APA. *See* 5 U.S.C. § 553(b) and (c).[21] The APA requires agencies to provide an opportunity for notice and comment prior to adoption or amendment of a rule, unless the rule is interpretive, a statement of policy, or a rule regarding agency organization, procedure or practice.[22] 5 U.S.C. § 553(b). The SEC does not dispute that it did not conduct notice and comment proceedings prior to issuing the *Cracker Barrel* letter. The agency argues, however, that its *Cracker Barrel* position is merely an interpretive rule, exempt from the § 553(b) notice and comment re-

(1) a statement of the time, place and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
Except when notice or hearing is required by statute, this subsection does not apply
(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure or practice....
5 U.S.C. § 553(b). If the notice requirements are applicable to a given rule, § 553(c) provides that:
After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submissions of written data, views, or arguments with or without the opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate into the rules adopted a concise general statement of their basis and purpose....
The APA defines "rule making" as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

22. Although § 553(b)(A) refers to "interpreta tive" rules, the Second Circuit Court of Appeals refers to such rules as "interpretive." *See Board of Educ. v. Harris*, 622 F.2d 599, 613 (2d Cir. 1979), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). The court adopts the Second Circuit's terminology. Also, in the past some courts have referred to legislative rules as "substantive" rules. Other courts have analyzed the "substantive" impact of the rule to distinguish between substantive rules and interpretive rules. To avoid any potential confusion, this court adopts the legislative/interpretive terminology. *See White v. Shalala*, 7 F.3d at 303; *Metropolitan School Dist. v. Davila*, 969 F.2d 485, 488 (7th Cir.1992) (because an interpretation of the meaning of a statute can be as 'substantive' as a legislative rule, the court prefers the legislative/interpretive terminology), *cert. denied*, —— U.S. ——, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993).

quirements applicable to legislative rules. Plaintiffs, on the other hand, maintain that the *Cracker Barrel* rule is a legislative rule that can be adopted only pursuant to notice and comment rule making.

As courts repeatedly note, the distinction between legislative and interpretive rules is "'far from crystal clear.'" *E.g., Metropolitan School Dist.*, 969 F.2d at 489, *quoting Chemical Waste Management, Inc. v. EPA*, 869 F.2d 1526, 1534 (D.C.Cir.1989). In this circuit, the distinction has been described as "enshrouded in considerable smog." *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). In an effort to clear the air in the following discussion, the court first surveys the factors courts have found relevant to this distinction and identifies courts' primary areas of focus. With an eye to courts' predominant concerns, the court then turns to the facts of this case.

### A. The Legislative Versus Interpretive Distinction.

Despite the acknowledged difficulty of the task, courts repeatedly attempt to identify principled distinctions between the two kinds of rules. Not surprisingly, the factors relevant to the characterization of a rule as legislative or interpretive are nearly as numerous as the decisions discussing the issue. They can be grouped according to four primary foci: 1) the effect of the agency's rule, 2) the agency's authority to adopt the rule, 3) the agency's method of devising the rule, and 4) the rule's regulatory history.

### 1. Effect of the Rule.

Courts distinguishing interpretive from legislative rules often focus on factors relating to the effect of the rule. As the D.C. Circuit has articulated this type of analysis, "[legislative] rules are ones which grant rights, impose obligations, or produce other significant effects on private interests.... Interpretive rules, by contrast, are those which merely clarify or explain existing law or regulations." *American Hospital Ass'n*, 834 F.2d at 1045; *see also White v. Shalala*, 7 F.3d at 303 ("[t]he central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act."). The D.C. Circuit's en banc decision in *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir.1984) (*en banc*), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985), is often cited as the source for an analysis that looks to the effect of the rule in question. The *General Motors* court explained the distinction as follows:

> An interpretive rule simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.' On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule.

*General Motors Corp.*, 742 F.2d at 1565, quoting *Citizens to Save Spencer County v. United States EPA*, 600 F.2d 844, 876 & n. 153 (D.C.Cir.1979).

As these decisions suggest, in some cases courts have found the effect of a rule to be indicative of whether it is legislative or interpretive. Nonetheless, courts have struggled with the fact that a broadly applied "effects test" could sweep all agency action into the legislative category, requiring unnecessary and cumbersome notice and comment proceedings. Courts have thus qualified the "effects test," noting that whether a rule has some effect on parties cannot be the conclusive criterion distinguishing interpretive from legislative rules, because at some level, most rules affect some interested party. *See, e.g., Metropolitan School Dist.*, 969 F.2d at 490 (that agency interpretation created new obligations on part of regulated parties did not render regulation legislative); *Alcaraz*, 746 F.2d at 613 ("that the regulations may have altered administrative duties or [sic] other hardships does not make them substantive"); *American Postal Workers Union*, 707 F.2d at 560 ("the impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals").

Courts have struggled to contain the potentially broad sweep of an "effects test," defining a narrow set of effects that are relevant to the analysis, and, in some cases,

abandoning analysis of the rule's effect altogether. An example of the latter course is *Fertilizer Institute,* in which the D.C. Circuit disavowed *General Motors* to the extent that it had been read to support a distinction between legislative and interpretive rules based in any way on their effects. *Fertilizer Inst. v. United States EPA,* 935 F.2d 1303, 1308 (D.C.Cir.1991) ("This court's holding in *General Motors* that an agency's action is deemed to be legislative when the agency '*intends* to create new ... duties' ... does not mean that an agency's action is legislative whenever it has the *effect* of creating new duties"). The *Fertilizer Institute* court concluded that "the proper focus in determining whether an agency's act is legislative is the source of the agency's action, not the implications of that action." *Id.* at 1308; *see also United Technologies Corp. v. United States EPA,* 821 F.2d 714, 719–20 (D.C.Cir. 1987). In a more recent decision, however, the D.C. Circuit returned to a limited "effects test," defining legislative rules as those that have "legal effect," or " 'the force of law.' " *See American Mining Congress v. Mine Safety & Health Admin.,* 995 F.2d 1106, 1109 (D.C.Cir.1993). To the extent that other courts continue to consider a rule's effect as indicative of whether it is interpretive or legislative, most seem to use analyses similar to the "legal effect test" adopted by the *American Mining Congress* court. *See Metropolitan School Dist.,* 969 F.2d at 490 ("legislative rules have the force and effect of law—they are as binding upon courts as congressional enactments"); *First Nat. Bank v. Sanders,* 946 F.2d 1185, 1188 (6th Cir.1991) (" 'substantive rules are rules that create law,' " quoting *Southern California Edison Co. v. Federal Energy Regulatory Commission,* 770 F.2d 779, 783 (9th Cir.1985)). The Second Circuit appears to have endorsed a legal effects test, instructing courts to look "to whether a rule 'changed existing rights and obligations.' " *New York v. Lyng,* 829 F.2d 346, 353 (2d Cir.1987), *quoting Donovan v. Red Star Marine Servs., Inc.,* 739 F.2d 774, 783 (2d Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1985); *see White v. Bowen,* 636 F.Supp. 1235, 1241

(S.D.N.Y.1986) ("In drawing the line between substantive and interpretive rules, the Second Circuit no longer looks to the impact of the rule, ... but focuses instead upon the change in law effected by a rule. Only rules that do not change existing rights and obligations are considered interpretive") (internal quotations omitted), *aff'd* 835 F.2d 974 (2d Cir.1987).

■ Courts looking for evidence of a rule's legal effect sometimes analyze the extent to which the rule constrains the discretion otherwise enjoyed by the agency and reviewing courts. Legislative rules, adopted through notice and comment proceedings, bind the agency and reviewing courts. *E.g. National Family Planning & Reproductive Health Ass'n v. Sullivan,* 979 F.2d 227, 234 (D.C.Cir.1992) ("National Family Planning") ("an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked"); *Metropolitan School Dist.,* 969 F.2d at 490 ("legislative rules have the force and effect of law—they are as binding upon courts as congressional enactments. Interpretive rules, although they are entitled to deference, do not bind reviewing courts") (internal citations omitted); *Community Nutrition Institute v. Young,* 818 F.2d 943, 948 (D.C.Cir.1987) (the announcement of an agency's enforcement policy that constitutes a "cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule"); *Pickus v. United States Bd. of Parole,* 507 F.2d 1107, 1113 (D.C.Cir.1974) (guidelines for determining parole eligibility were "not interpretations of a statute's meaning. Rather they are self imposed controls over the manner and circumstances in which the agency will exercise its plenary power"). By contrast, interpretive rules "carry no more weight on judicial review than their inherent persuasiveness commands." *Batterton v. Marshall,* 648 F.2d at 702; *see also General Electric Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Harris,* 622 F.2d at 613.[23]

**23.** Although interpretive rules do not necessarily bind agencies and reviewing courts, they are

" 'binding' on the regulated parties in the sense

As a corollary to the rule that legislative regulations are those that have the effect of binding courts and agencies, the D.C. Circuit held that where agency action altering a past position is at issue, intervening judicial decisions are relevant. A court's treatment of an agency interpretation of its regulations as binding suggests that the agency's alteration of that interpretation constitutes a legislative act. *See National Family Planning,* 979 F.2d at 236 ("The fact that the Supreme Court has read the 1988 regulation to prohibit abortion counseling by doctors, is persuasive evidence that HHS' current view that the regulation permits physicians to so counsel is a legislative rule"); *see also Chamber of Commerce v. Occupational Safety & Health Admin.,* 636 F.2d 464 (D.C.Cir.1980).

## 2. Authority Exercised in Rule Making.

██ A second approach to distinguishing legislative from interpretive rules focuses on the nature of the authority exercised by the agency in its rule making.[24] An example of this type of analysis is the D.C. Circuit's decision in *Fertilizer Institute.* As noted above, the *Fertilizer Institute* court held that "the proper focus in determining whether an agency's act is legislative is the source of the agency's action, not the implications of that action." *Fertilizer Institute,* 935 F.2d at 1308.[25] This same type of approach has been taken in earlier D.C. Circuit decisions. *See United Technologies Corp.,* 821 F.2d at 719–20 ("If the rule is based on specific statutory provisions, ... it is an interpretative rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one"); *American Postal Workers Union,* 707 F.2d

at 560 ("our decision that a [regulation] ... was a legislative rule was based not on the rule's impact but rather on the fact that it was promulgated pursuant to a specific delegation of legislative power in the governing statute").

In determining the nature of the authority exercised by an agency, courts view the agency's characterization of its action as relevant, but not dispositive. *Lewis–Mota v. Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir.1972); *see also American Mining Congress,* 995 F.2d at 1109 (agency publication of rule in Code of Federal Regulations suggests that it is legislative rather than interpretive). More telling than the agency's characterization of its rule is an analysis of the agency action in light of the underlying statutory and regulatory framework. Where Congress "has not 'legislated and indicated its will' " on the subject of the rule, the rule is probably legislative. *Chamber of Commerce,* 636 F.2d at 469. Put another way, agency action is probably legislative "where, in the absence of a legislative rule by the agency, the legislative basis for agency enforcement would be inadequate." *American Mining Congress,* 995 F.2d at 1109.

## 3. Analytic Tools Employed in Rule Making.

A third approach to distinguishing legislative from interpretive rules is to focus on the agency's rule-making method, in particular, the tools that the agency employs in developing the rule. Courts taking this approach categorize a rule as interpretive when the agency uses the "classic tools" of statutory or regulatory interpretation, including analysis of the text of the law or rule, its legislative history, and any judicial decisions interpret-

---

that they set, for the time, the legal minima of behavioral standards." *Alcaraz,* 746 F.2d at 614.

24. In many cases, courts have considered the nature of the rule-making authority exercised by the agency as evidence of the rule's legal effect. *See, e.g., American Mining Congress,* 995 F.2d at 1112 ("legal effect" is shown if "the agency has explicitly invoked its general legislative authority"); *Metropolitan School Dist.* 969 F.2d at 490 (analysis should focus on "the kind of power the agency is using, and hence the force and effect of the rule"). While the court acknowledges that these issues are interrelated, it finds that sepa-

rate consideration of them promotes analytic clarity.

25. Indeed, a first step in labeling a rule is to ascertain whether the agency even has legislative rule-making authority. *See American Postal Workers,* 707 F.2d at 558. "A rule can be legislative only if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue." *Id.* Once it is found that an agency possesses legislative rule-making authority, it must be determined whether that authority was exercised in the case at hand.

ing it. *E.g. Metropolitan School Dist.*, 969 F.2d at 490; *General Motors*, 742 F.2d at 1565 (finding rule interpretive where agency's "entire justification for the rule is comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history"); *National Family Planning*, 979 F.2d at 237 ("sometimes courts also give weight on the interpretative side to the fact that an agency's rule is explicitly based upon an analysis of the meaning of the statute or regulation").

Conversely, courts taking this approach hold that rules are legislative where the agency has relied upon its own expertise in the area or newly emerging public policy concerns. *See, e.g., National Family Planning*, 979 F.2d at 238 (finding legislative rule where the directives issuing the rule made no reference to defining regulatory terms as the purpose of the rule and the rule was based on a "previously unacknowledged concern"); *Southern California Aerial Advertisers' Ass'n v. Federal Aviation Admin.*, 881 F.2d 672, 677 (9th Cir.1989) (finding new rule legislative where it was prompted by agency's safety concerns rather than the language or history of the regulations the agency purported to interpret). A legislative rule is one that " 'by no stretch of the imagination could . . . have been derived by mere 'interpretation' of the instructions of Congress.' " *National Family Planning*, 979 F.2d at 237, *quoting Citizens to Save Spencer County*, 600 F.2d at 879.

#### 4. Regulatory History of the Rule.

A fourth approach is to focus on the rule's regulatory history—whether the rule amends an earlier legislative or interpretive rule.[26] A rule that constitutes a new agency position is not necessarily a legislative rule. *See Metropolitan School District*, 969 F.2d at 489–91 (finding Secretary's letter providing interpretation of statute on question never before addressed was interpretive, not legislative, rule); *see also Michigan v. Thomas*, 805 F.2d 176, 182–84 (6th Cir.1986); *Alcaraz*, 746 F.2d at 613–14; *American Postal Workers*

*Union*, 707 F.2d at 559–60. Nonetheless, if a rule " 'repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.' " *American Mining Congress*, 995 F.2d at 1109, *quoting National Family Planning*, 979 F.2d at 235 (internal quotations omitted). Conversely, as the Second Circuit recently held, an agency may change its earlier interpretation of a statute through re-interpretation, without being deemed to have issued a legislative rule. *White v. Shalala*, 7 F.3d at 304 ("[A]n interpretive rule changing an agency's interpretation of a statute is not magically transformed into a legislative rule.").

#### 5. Summary of Approaches to Distinguishing Legislative and Interpretive rules.

The court believes that no one of the four approaches identified *supra* provides a definitive test for distinguishing between legislative and interpretive rules. With abundant experience in the field, the Court of Appeals for the D.C. Circuit has concluded that "[d]etermining whether a given agency action is interpretive or legislative is an extraordinarily case-specific endeavor." *American Hosp. Ass'n*, 834 F.2d at 1045. As the following discussion of the *Cracker Barrel* rule indicates, the court believes that while all four approaches are relevant to its analysis, the particular weight accorded each approach may turn upon the facts of the rule making in question.

#### B. Analysis of the Cracker Barrel Rule.

As noted above, the regulatory history of a rule can assist in distinguishing legislative from interpretive rules. All courts faced with a rule amending a legislative rule have found the amendment to be a legislative rule. *See National Family Planning*, 979 F.2d at 234, 239; *Southern California Aerial Advertisers' Ass'n*, 881 F.2d at 678; *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408,

---

**26.** As with the nature of the authority exercised, discussed *supra*, courts have considered the regulatory history of a rule as evidence of a rule's legal effect. *See American Mining Congress*, 995

F.2d at 1112 (legal effect shown where "rule effectively amends a prior legislative rule"). Again, the court believes that separate identification of each factor promotes analytical clarity.

412 (7th Cir.1987); *cf. White v. Shalala,* 7 F.3d at 304. Reviewing its decisional law on the question, the D.C. Circuit recently held that the fact that a rule amends a prior legislative rule is conclusive evidence of the amending rule's legal effect. *American Mining Congress,* 995 F.2d at 1112. The court concludes that the SEC's *Cracker Barrel* rule constituted an amendment of a prior legislative rule. Based on this regulatory history, as well as the other factors discussed above, the court concludes that the *Cracker Barrel* rule was a legislative rule requiring notice and comment procedures prior to its adoption. While the following discussion of the *Cracker Barrel* rule gives particular weight to the rule's regulatory history, the court notes that application of the other factors leads to the same conclusion.

Although the regulatory history of the *Cracker Barrel* rule stretches back to 1942, when the SEC first adopted rules governing a company's obligation to include shareholder proposals, the most relevant history begins in 1976, when the SEC, after notice and comment proceedings, adopted a rule that companies cannot exclude from their proxy materials shareholder proposals dealing with ordinary business operations if the proposals involve substantial policy considerations. As outlined below, the court finds that the 1976 rule was a legislative rule, and that the *Cracker Barrel* letter constituted an amendment of that legislative rule.

### 1. The 1976 Rule.

It is indisputable, and the SEC does not contest, that the actual text of Rule 14a–8(c)(7), adopted in 1976, was a legislative rule. This text provides that management can exclude a proposal if it "deals with a matter relating to the conduct of the ordinary business operations of the issuer." The SEC conducted its 1976 rule making pursuant to its authority under § 14(a) of the

Securities Exchange Act of 1934 ("Exchange Act"). *See* 15 U.S.C. § 78n(a).[27] The SEC gave notice of its rule making, provided an opportunity for comment prior to adopting this text, *Proposed 1976 Amendments,* 41 Fed.Reg. at 29,982, and then published the adopted rule in the Code of Federal Regulations. 17 C.F.R. § 240.14a–8(c)(7); *see American Mining Congress,* 995 F.2d at 1109 (identifying publication of a rule in the Code of Federal Regulations as an important factor indicating rule is legislative). The ordinary business operations exception adopted in 1976 could not have been derived by mere "interpretation" of the broad language and legislative history of Section 14(a) of the Exchange Act. *See National Family Planning,* 979 F.2d at 237. Thus, it is clear that the actual text of the ordinary business operations exception adopted in 1976, Rule 14a–8(c)(7), was a legislative rule.

As noted above, the SEC's release adopting the rule discussed the purpose underlying the ordinary business operations exception and gave particular content to the rule. In this explanation of the rule ("1976 Explanation"), the SEC made clear that it essentially retained the old language for the ordinary business operations exception with the understanding that the rule would be read more flexibly than in the past, in order to avoid excluding proposals involving substantial policy considerations. *Adoption of 1976 Amendments,* 41 Fed.Reg. at 52,997–98.

The question facing the court is whether the SEC's 1976 Explanation of its legislative rule, which gave new content to the rule, was itself part of the legislative rule, and therefore is unalterable without prior notice and comment. The SEC maintains that the 1976 Explanation was interpretive, rather than legislative. The court concludes, however, that it was part of the legislative rule. This

---

**27.** In § 14(a) of the Exchange Act, Congress delegated plenary authority to the SEC to enact proxy rules that have the force and effect of law, with little guidance as to what Congress intended. Congress required only that the rules adopted by the SEC be "necessary or appropriate in the public interest or for the protection of investors," 15 U.S.C. § 78n(a). Given this broad Congressional authority, the SEC certainly possesses the requisite authority to adopt legislative

rules. *See American Postal Workers Union,* 707 F.2d at 558. Indeed, in the *Attorney General's Manual on the Administrative Procedure Act,* the SEC's proxy rules under section 14 are identified as classic examples of legislative rules. *See Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977), *quoting Attorney General's Manual on the Administrative Procedure Act* (1947)).

conclusion is based on the court's finding that (1) the SEC's 1976 Explanation of the ordinary business operations exception was developed using the SEC's legislative rule-making tools and authority and (2) the 1976 Explanation has had a legally binding effect.

### a. Agency's Method and Authority for Rule Making.

■ As was noted above, one of the dominant approaches to distinguishing between interpretive rules and legislative rules is to consider whether, in adopting the rule, the agency used its "power to exercise its judgment as to how best to implement a general statutory mandate," in which case the rule is legislative. *United Technologies Corp.*, 821 F.2d at 720. The agency's own characterization of its rule making is evidence of whether it is legislative or interpretive. *General Motors Corp.*, 742 F.2d at 1565. The SEC treated the 1976 Explanation as legislative by providing notice and comment on the question it addresses.

In announcing its proposed rule making, the agency noted that issuers had used the ordinary business operations exception to exclude proposals involving important matters, and expressed its concern that as a result, its regulations did not accord with Section 14 of the Exchange Act. *Proposed 1976 Amendments*, 41 Fed.Reg. at 29,984–85. The SEC proposed two alternative formulations of the rule in order to address this concern. After providing for notice and comment on the issue, the SEC's response to this concern was to retain the "ordinary business operations" exception, subject to the 1976 Explanation of the exception. This new understanding was the product of notice and comment proceedings and therefore had the hallmark of a legislative rule.

■ The SEC claims that it did not follow notice and comment procedures for developing the 1976 Explanation of the rule. The agency maintains that because it ultimately decided not to adopt either of the proposed alternatives that were noticed and commented upon, it is incorrect to conclude that the standard it actually *adopted* was subject to notice and comment procedures. SEC Reply Br. at 23–24.[28]

The court disagrees. The SEC retained language similar to the 1954 language subject to its new understanding, because that approach was more workable than the proposed alternatives, not because the SEC determined that no change in the rule was needed. The 1976 Explanation of the ordinary business operations language, announced in lieu of the proposed alternatives, was no less a legislative rule than either of the alternative rules would have been had they been adopted. Thus, in 1976, the SEC treated both the amended Rule 14a–8(c)(7) and the explanatory material that accompanied it as legislative rules, by employing notice and comment proceedings to develop them. Although not dispositive, the agency's treatment of a rule as legislative suggests that the rule was in fact adopted pursuant to the agency's legislative rule-making authority. *Lewis–Mota*, 469 F.2d at 481–82.

The conclusion that the SEC's 1976 Explanation of Rule 14a–8(c)(7) was itself legislative is further supported by the fact that the SEC's explanation was not drawn from the text of either Section 14(a) or its own rule. *See Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977). Rule 14a–8(c)(7)'s "ordinary business operations" language is too imprecise to permit one to derive from that language alone the SEC's 1976 position on proposals involving substantial policy considerations. *See Grimes v. Centerior Energy Corp.*, 909 F.2d 529, 531 (D.C.Cir.1990), *cert. denied*, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991) ("[u]nfortunately, the phrase ['ordinary business operations'] has no precise definition"); *see also Roosevelt v. E.I. Du Pont de Nem-*

28. The SEC offers no authority for the proposition, inherent in its argument, that the rule that is adopted must mirror the rule that was proposed for the former to be deemed to have been adopted pursuant to notice and comment. The SEC has the power to adopt rules that vary in some respects from those noticed and subject to comment. *See International Harvester Co. v.*

*Ruckleshaus*, 478 F.2d 615, 632 n. 51 (D.C.Cir. 1973) (an agency must have authority to promulgate a final rule that differs in some particulars from its proposed rule; a contrary position would lead to the "absurdity that ... the agency can learn from the comments on its own proposals only at the peril of starting a new procedural round of commentary").

*ours & Co.*, 958 F.2d 416, 426 (D.C.Cir.1992); *New York City Employees' Retirement System v. Dole Food Co.*, 795 F.Supp. 95, 100 (S.D.N.Y.), *vacated, appeal dismissed*, 969 F.2d 1430 (2d Cir.1992). The explanatory materials accompanying the SEC's 1976 amendments cannot be characterized as an effort by the SEC to clarify the underlying regulation and statute or to "remind effected parties of existing duties." *General Motors*, 742 F.2d at 1565. Rather, the agency drew on its twenty-two years of experience in administering the rule "to fill gaps" in the statutory and regulatory scheme. *United Technologies Corp.*, 821 F.2d at 719. The 1976 Explanation reflected the agency's newfound concern that certain proposals that could be said to deal with ordinary business operations might nonetheless involve issues of considerable importance to shareholders. *Southern California Aerial Advertisers' Ass'n*, 881 F.2d at 677 (finding new rule legislative where it was prompted by agency's safety concerns rather than the language or history of the regulations the agency purported to interpret). The court finds that the authority and analytic tools employed by the agency to give content to its 1976 amendments were those of legislative rule making.

### b. 1976 Rule's Legal Effect.

The conclusion that the SEC's 1976 Explanation was a legislative rule is supported not only by the nature of the authority exercised by the agency, but also by the fact that its position has had the legal effect of binding both the agency and reviewing courts. In announcing the rule, the SEC stated unequivocally that "proposals ... that have major implications, will in the future be considered beyond the realm of an issuer's ordinary business operation, and future interpretative letters of the Commission's staff will reflect that view." *Adoption of 1976 Amendments*, 41 Fed.Reg. at 52,998. Accordingly, until the SEC issued the *Cracker Barrel* letter, the agency had repeatedly informed companies that they could not exclude shareholder proposals regarding equal employment opportunity and affirmative action policies, because such policies involve substantial policy considerations. *See, e.g., AT & T*, 1990 WL 285826, 1990 SEC No–Act. LEXIS 20 (Jan. 5, 1990). In a 1984 no-action letter to Texaco, Inc., the SEC stated:

> The Commission has given content to the term "ordinary business" by declaring that Rule 14a–8(c)(7) is not available to exclude proposals which raise important policy matters, but only may be used if the issue raised by the proponent is "mundane in nature." Thus, in promulgating the present version of Rule 14a–8(c)(7) the Commission stated in Release 34–12999 (November 22, 1976) that proposals "which have significant policy, economic or other social implications inherent in them" would not be excluded by Rule 14a–8(c)(7)....

*Texaco, Inc.*, 1984 WL 48457, \*12, 1984 SEC No–Act. LEXIS 1846, \*3–\*5 (Feb. 28, 1984) (emphasis added). Less than a year before the SEC issued *Cracker Barrel*, the SEC advised the D.C. Circuit Court of Appeals that "[i]n 1976 the Commission *established the principles* by which it *intended the* "*ordinary business" provision* of Rule 14a–8 to be interpreted." *Brief of Securities Exchange Commission, Amicus Curiae* at 29, *filed in Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416 (D.C.Cir.1992) (emphasis added). The SEC explained for the benefit of that court that "[t]he underlying theme behind the discussion of Rule 14a–8(c)(7) in the 1976 Release is that a shareholder proposal *must be analysed* on the basis of whether its subject matter has 'major implications' for the company, or whether 'significant policy, economic or other implications' are inherent in the proposal." *Id.* at 30 (emphasis added).

The SEC's 1976 Explanation cabined the agency's discretion in a manner similar to that considered by the D.C. Circuit in *Pickus. See Pickus*, 507 F.2d at 1110. In *Pickus*, the court held that the Board of Parole's guidelines, which specified many of the factors that the Board would consider in exercising its discretion to parole federal prisoners, were legislative rules. *See id.* at 1113. The court explained:

> The Board's statements are not interpretations of a statute's meaning. Rather, *they are self imposed controls over the manner and circumstances in which the agency will exercise its plenary power.*

*Id.* (emphasis added). *Pickus* has been cited by the D.C. Circuit Court of Appeals as the "classic example of an agency rule held not to be interpretive," because the parole guidelines "were calculated to have a substantial effect on ultimate parole decisions," *American Hospital Ass'n*, 834 F.2d at 1046, by effectively directing the Board's discretionary judgment. *See National Family Planning*, 979 F.2d at 234; *Batterton v. Marshall*, 648 F.2d at 707; *Guardian Federal Savings & Loan Assn. v. Federal Savings & Loan Ins. Corp.*, 589 F.2d 658, 667 n. 28 (D.C.Cir. 1978). Similarly, the SEC's explanation of its 1976 rule constrained its discretion, suggesting that the explanation was itself legislative.

This conclusion is further supported by the fact that reviewing courts have consistently considered themselves bound by the interpretive gloss the SEC put on the ordinary business operations language in 1976. *See, e.g., Grimes v. Ohio Edison Co.*, 992 F.2d at 457 (describing ordinary business operations rule as providing that "only 'business matters that are mundane in nature and do not involve any substantial policy' considerations may be omitted under exemption 7"). Thus, the SEC's 1976 Explanation has had a legal effect on parties' rights before both the agency and reviewing courts. Based on the foregoing analysis, the court finds that the 1976 rule, including the 1976 Explanation, was a legislative rule.

### 2. The SEC's Reversal of its 1976 Position.

■ As noted above, the court finds that in 1976, the SEC adopted a legislative rule that shareholder proposals involving substantial policy concerns may not be omitted from proxy statements, regardless of whether they would otherwise fit within the ordinary business operations exception. As a legislative rule, the SEC's 1976 position may not be altered without notice and comment unless the alteration can be characterized as a legitimate interpretation of Rule 14a–8(c)(7) as it was understood by the SEC until October 1992. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *National Family Planning*, 979 F.2d at 234;

*Homemakers North Shore, Inc.*, 832 F.2d at 412.

In the *Cracker Barrel* no-action letter, the SEC changed its 1976 position on proposals involving substantial policy considerations under the ordinary business operations exception: the SEC stated that all employment-related proposals would henceforth be excludable under the ordinary business operations exception, even if they involve substantial policy concerns. *Cracker Barrel Old Country Stores, Inc.*, 1992 WL 289095 at *1, 1992 SEC No–Act. LEXIS at *1 ("the Division has determined that the fact that a shareholder proposal concerning a company's employment policies and practices for the general workforce is tied to a social issue will no longer be viewed as removing the proposal from the realm of ordinary business operations of the registrant").

Significantly, the SEC's conclusion that Cracker Barrel could exclude the NYCERS proposal was not based on a finding that the proposal raised no substantial policy considerations. Had the SEC made such a finding, its conclusion could be construed as an interpretive rule, clarifying the language, "substantial policy considerations." *See ACTWU*, 821 F.Supp. at 890, n. 13. On the contrary, the SEC found that the proposal raised substantial policy considerations, but was nonetheless excludable.

As indicated above, nothing in the SEC's discussion of the 1976 rule, nor in its enforcement of the rule prior to the *Cracker Barrel* letter, suggested that the "substantial policy considerations" position did not apply to employment-related proposals. The court finds that the *Cracker Barrel* letter was inconsistent with the language and purpose of the SEC's legislative rule embodied in the 1976 Explanation. *See National Family Planning*, 979 F.2d at 234. The letter constituted an amendment to that rule, altering a position that had been treated as binding by both the agency and reviewing courts. *See Grimes v. Ohio Edison Co.*, 992 F.2d at 457. Such an amendment is itself a legislative rule. *See American Mining Congress*, 995 F.2d at 1109 (rule repudiating prior legislative rule is a legislative rule); *National Family Planning*, 979 F.2d at 236 ("when an

agency's rule runs in the opposite direction from a court's previous interpretation of its statutory requirements, that is strong evidence that the agency is making a legislative, not an interpretative rule"). Thus, the regulatory history of the SEC's *Cracker Barrel* position indicates that it is a legislative rule requiring notice and comment prior to implementation.

Consideration of other factors distinguishing legislative and interpretive rules confirms the foregoing conclusion. First, the SEC adopted its *Cracker Barrel* position pursuant to its broad rule-making authority under the Exchange Act. Moreover, in devising its new position, the SEC did not purport to interpret specific statutory or regulatory terms, but rather, drew on its experience and expertise to make new law. *Cracker Barrel Old Country Stores, Inc.*, 1992 WL 289095 at *18, 1992 SEC No–Act. LEXIS at *2 ("In recent years, however, the line between includable and excludable employment-related proposals based on social policy considerations has become increasingly difficult to draw.... The Division has reconsidered the application of Rule 14a–8(c)(7) to employment-related proposals in light of these concerns and the staff's experience with these proposals in recent years.") The SEC's rationale for its new position suggests the rule is legislative rather than interpretive. *See Southern California Aerial Advertisers' Ass'n*, 881 F.2d at 677.

Finally, since adopting the *Cracker Barrel* position, the SEC has consistently abided by it, substantially affecting the legal rights of companies and shareholders. The D.C. Circuit has noted that while "in an ideal world one could ascertain at the outset the need for notice and comment," it is sometimes necessary "to await the sharpened facts that come from the actual workings of the regulation in question before striking the objective down as violative of the APA." *American Hosp. Ass'n*, 834 F.2d at 1056. In the year since the SEC issued its *Cracker Barrel* letter, the agency's consistent adherence to the *Cracker Barrel* position removes any doubt that the agency intended to adopt a new, binding legislative rule regarding shareholder proposals.

Based on the foregoing considerations, as well as the rule's regulatory history, the court concludes that the SEC impermissibly adopted a legislative rule in the *Cracker Barrel* letter without first giving the public notice and the opportunity to comment. Having decided that the *Cracker Barrel* rule should have been adopted pursuant to notice and comment, the court need not decide whether it is arbitrary and capricious as well. *See Nat'l Family Planning*, 979 F.2d at 241.

### Conclusion

In sum, the court finds that in 1976 the SEC adopted a legislative rule that shareholder proposals involving substantial policy considerations could not be omitted, regardless of the ordinary business operations exception. The SEC's *Cracker Barrel* position that employment-related proposals involving substantial policy considerations may be omitted constituted a reversal of the 1976 legislative rule. The SEC's *Cracker Barrel* position can be adopted only after the SEC follows the public notice and comment procedures contemplated by the APA.

As a final note, this court is well aware that any decision it renders must not unduly interfere with the SEC's practice of providing shareholders and corporations with guidance through the no-action letter process. In that regard, nothing in this decision imposes a requirement of notice and comment rule-making procedures whenever the SEC issues a no-action letter that adopts or alters an interpretive rule. *See White v. Shalala*, 7 F.3d at 304 (an interpretive rule amending a prior interpretive rule is not legislative); *National Family Planning*, 979 F.2d at 239 (finding legislative rule where "case concerns not an agency's first attempt at interpreting a statutory term but a situation where the agency has, through legislative rule making, already interpreted the statute, and is now changing that interpretation"). Only where, as here, the SEC decides to alter a prior legislative rule, must it refrain from doing so in the guise of an interpretive no-action letter. Rather, it must provide notice and comment opportunities to

interested parties before adopting its new rule.[29]

For the reasons stated in this opinion, the court grants plaintiffs' motion for summary judgment and denies defendant's motion to dismiss the complaint. The court hereby enjoins the SEC from issuing any letter in which the SEC takes a position inconsistent with the understanding of the "ordinary business operations" exception adopted by the SEC on November 22, 1976, until such time as the SEC adopts a different position in rule making pursuant to notice and comment.

SO ORDERED.

---

**29.** The APA's additional requirements of standing, finality, and ripeness also minimize the likelihood of litigation against the SEC over individual no-action letters. *See Int'l Union,* 783 F.2d at 246–51. The *Cracker Barrel* no-action letter possesses unique attributes that permit judicial review in this case. In contrast with most no-action letters, the *Cracker Barrel* letter stated a rule regarding a whole range of proposals; that position was affirmed by the Commission and has been repeated over half a dozen times.